Harry W. REED, Vince Gavin, Allen W. Proudfoot and Edward Neuman, as Co-executors of the Estate of Arthur Rubloff, Plaintiffs,

v.

BRAE RAILCAR MANAGEMENT, INC., Defendant.

No. 89 C 0729.

United States District Court,
N.D. Illinois, E.D.

July 5, 1989.

Dean A. Dickie, Phelan Pope & John, Chicago, Ill., for plaintiffs.

David Hepplewhite, Peter D. Kasdin Ltd., Chicago, Ill., Raymond Fitzgerald, Butler Fitzgerald & Potter, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The defendant has moved under Rule 12(b)(3) to dismiss for improper venue or in

the alternative under 28 U.S.C. § 1404(a) to transfer this action to the Northern District of California "[f]or the convenience of parties and witnesses [and] in the interests of justice." For the reasons set forth below, the motion to dismiss is denied and the motion to transfer is granted.

### I. Background [1]

The plaintiffs are the co-executors of the estate of Arthur Rubloff, a successful Chicago real estate developer. In October 1979, Rubloff purchased eighty-three covered hopper railcars from Braecar, Inc., a subsidiary of the Brae Corporation. Brae Corporation is now known as Brae Transportation, Inc. and will be referred to in this opinion as BTI. On the same day that Rubloff purchased the railcars from BTI, he entered into a five-year management agreement for the railcars with Brae Railcar Management, Inc. ("BRM"), another subsidiary of BTI and the defendant in this case. BRM is a Delaware corporation with its principal place of business in San Francisco. BRM's business is managing railcars, and as part of that business it monitors car movements, collects railcar rentals, contracts out for repair and maintenance and performs marketing services. Pursuant to its management agreement with Rubloff, BRM agreed to manage and operate Rubloff's railcars, enforce his rights with respect to the leases entered into by BRM, perform maintenance and repairs, and collect all sums due Rubloff.

BRM's parent BTI arranged for Rubloff's cars to be leased for a five-year term to the Warrenton Railroad, a short line railroad located in Warrenton, North Carolina. BTI also signed a shipping agreement with CF Industries, Inc. ("CF"), which provided for CF's use of the cars

**1.** The plaintiffs have the burden of establishing proper venue. *See Grantham v. Challenge–Cook Bros. Inc.,* 420 F.2d 1182, 1184 (7th Cir.1969); *First Financial Leasing Corp. v. Hartge,* 671 F.Supp. 538, 542 (N.D.Ill.1987) (Hart, J.). Although we have found no cases describing what evidence is necessary to meet this burden when venue is at issue, the Seventh Circuit has a well-defined standard for motions challenging personal jurisdiction: "The allegations in [the plaintiffs'] complaint are to be taken as true

unless controverted by the defendant['s] affidavits, and any conflicts in the affidavits are to be resolved in [the plaintiffs'] favor." *Turnock v. Cope,* 816 F.2d 332, 333 (7th Cir.1987). Venue and personal jurisdiction are similar, inasmuch as a defendant may waive the failure to meet either requirement. *See* Fed.R.Civ.P. 12(h)(1). Therefore, in the interest of consistency, we will apply the personal jurisdiction standard in the venue context.

during the term of the Warrenton lease. CF, a fertilizer producer, intended to use the Rubloff cars for shipping phosphate fertilizer products from CF's phosphate plants in central Florida.

At the end of the management agreement between Rubloff and BRM, problems arose between the two parties. The source of the problems is not completely clear from the complaint or the subsequently filed materials, but it is not important to the resolution of the motion before us. At any rate, on January 27, 1989, the plaintiffs, who now stand in Rubloff's shoes, brought suit against BRM. Count I asserts that BRM breached its management agreement with Rubloff by failing to enforce Rubloff's rights as to leased railcars; to return the railcars to Rubloff in a clean condition; to return the railcars to Rubloff in a good condition; to perform normal maintenance; to notify Rubloff of necessary repairs; and to use its best efforts to collect all sums that Rubloff was due. Count II raises essentially the same claims, but clothes them in the garb of breach of fidiciary duty. Jurisdiction over both counts is based on diversity.

The complaint asserts that venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(a), because the claim "arose" here. In their response to BRM's motion to dismiss, the plaintiffs also assert that venue is proper under 28 U.S.C. § 1391(c), because BRM is doing business here. BRM does not object to the plaintiffs belatedly raising the doing business argument, so we will consider that argument in this opinion. Because we conclude that BRM is "doing business" in the Northern District of Illinois we will not consider whether the plaintiffs' claim arose here.

II. *Section 1391(c)—Doing Business*

Under section 1391(a),

A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose.

In its reply, the plaintiffs contend that BRM "resides" in this district. The residence of a corporation such as BRM is determined by 28 U.S.C. § 1391(c), but in the present case, there are two versions of section 1391(c) that might be applied. As noted previously, this case was brought on January 27, 1989; at that time, section 1391(c) read as follows:

> A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes.

On February 17, 1989, however, an amendment to section 1391(c) took effect. In pertinent part, it now reads:

> For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.

BRM argues that the version of section 1391(c) in effect when the plaintiffs brought their suit should apply. Since the plaintiffs do not argue otherwise, we will assume, without deciding, that the old version applies,[2] and that "doing business" is the proper test.

■ Courts disagree about the correct time frame for determining if a corporation is doing business in a district. Some cases have held that it is sufficient if the corporation was doing business at the time the claim arose. *See, e.g., In re Dalkon Shield Litigation*, 581 F.Supp. 135, 138 n. 3

---

**2.** We note, however, that plaintiffs could argue that the present version of the statute should be used. *See United States v. Kimberlin*, 776 F.2d 1344, 1346 (7th Cir.1985) ("A court generally applies the law governing at the time of its decision. . . .), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2251, 90 L.Ed.2d 697 (1986). *But see United States v. Kairys*, 782 F.2d 1374, 1381 (7th Cir.) ("Legislative enactments are presumed to

be prospective absent clear statements by Congress to the contrary."), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986). The resolution of this seeming contradiction may turn on whether a defendant's "right" not to be sued in a particular venue is a substantive right or merely a remedial or procedural right. *See Kairys*, 782 F.2d at 1381.

(D.Md.1983). *See generally* 15 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3811 at 115 and n. 57 (2d ed. 1986) [hereinafter Wright, Miller & Cooper]. Other cases, however, have required that the corporation be doing business in the district at the time the suit is brought. *See, e.g., Sunray Enterprises, Inc. v. David C. Bouza & Assocs.*, 606 F.Supp. 116, 118 n. 2 (S.D.N.Y.1984). The latter line of cases seem to have the better of the argument. The old version of section 1391(c) is in the present tense and provides that a corporation "may be sued in any judicial district in which it ... *is* doing business." (emphasis added). Therefore, we must look at whether BRM is now doing business in this district.

■ The plaintiffs present little evidence that BRM is doing business here in Illinois. They claim that Rubloff signed the management agreement with BRM in Chicago, but that was in 1979 and does not go to the question of whether BRM is doing business here in 1989. The plaintiffs attempt to cure this deficiency by presenting evidence about BRM's parent, BTI. For example, they contend that BTI maintains an office in Itasca, Illinois, which is within this district, and that someone at that office—plaintiffs do not tell us who—represented that BTI could do business for BRM. In addition, the plaintiffs assert that BTI, then known as the Brae Corporation, had an office in Chicago in 1984 and 1985, at the time the management agreement was coming to an end, and that the Brae Corporation's Regional Manager attempted to renegotiate that agreement. Based on these factors, the plaintiffs argue that venue is proper for BRM.

However, there is a logical difficulty here, which the plaintiffs' brief glosses over with conclusory statements. The evidence presented shows that BTI maintains an office in Itasca and thus may be considered to be doing business in this district; that does not mean, however, that BTI's subsidiary BRM is also doing business here. Nonetheless, we conclude that BRM

may be considered to be doing business in this district. The general rule is that "the court will respect the corporate form and will not attribute the business of [a parent to a subsidiary] so long as a real and substantial separation exists, but will treat the corporate enterprise as an entity if it has been operated as such and no real autonomy exists." 15 Wright, Miller & Cooper, *supra*, § 3811 at 123–25; *see also, e.g., Scott Paper Co. v. Nice–Pak Products, Inc.*, 678 F.Supp. 1086, 1089 (D.Del. 1988). We do not know whether BRM and BTI generally act as separate entities, but it is clear that they did not do so for purposes of the management agreement. The same day that Rubloff purchased the eighty-three railcars from one subsidiary of BTI, it entered the management agreement with BRM. Moreover, even though it was BRM that managed the railcars, it was BTI (then known as the Brae Corporation) which agreed to lease the cars to the Warrenton Railroad and signed a shipping agreement with CF. Finally, Robert Brownson, the president of the Rubloff Development Corporation[3] dealt with BTI's Regional Manager, Michael Calabucci, when the problems under the management agreement became apparent. *See* R. Brownson Affidavit ¶ 4, attached as Exh. B to Plaintiffs' Response Brief. A letter from Calabucci to Brownson, dated December 26, 1984, indicates that Calabucci considered BTI to be the leading party with regard to the management agreement. The language Calabucci used is particularly telling. As way of background, Calabucci reminded Brownson that he previously presented two proposals "on behalf of BRAE Transportation, Inc. regarding the future operations of the 83 ... cars which ... are currently included in a Management Agreement with BRAE." Calabucci then goes on to restate the two proposals. "BRAE Transportation, Inc. proposes to Rubloff a new Management Agreement.... [Alternatively,] BRAE Transportation, Inc. proposes to purchase all of Rubloff's 83 cars." In the rest of the letter, Calabucci urges Brownson to act

---

**3.** Apparently, the Rubloff Development Corporation managed Rubloff's investments while he was alive and continued to do so for his estate after he died.

quickly, and three times refers to the management agreement as "our" agreement. Letter from M. Calabucci to R. Brownson, Dec. 26, 1984, attached as Exh. E to Plaintiffs' Response Brief.

These facts make it clear that BTI and BRM operated as a single entity for the purposes of the management agreement, and should be treated as such for the purposes of this litigation. Accordingly, because BTI is doing business in this district, we will consider BRM to be doing business here as well. Venue is therefore proper.

### III. Section 1404(a) Transfer

■ In the alternative, BRM asks us to transfer this case to its home district, the Northern District of California, under 28 U.S.C. § 1404(a).[4] As we have noted recently, a party moving under section 1404(a) must demonstrate that venue is proper in the transferor and transferee districts, and that transfer serves the convenience of parties and witnesses and the interests of justice. *Shima American Corp. v. S.M. Arnold, Inc.*, No. 88 C 10064, slip op. at 6, 1989 WL 65014 (N.D.Ill. June 5, 1989). As we established in section II, venue is proper here, and because BRM has its home office in San Francisco, venue is also proper in the Northern District of California. The parties disagree, however, whether the transfer serves the convenience of parties and witnesses and the interests of justice.

After considering the parties' arguments, we conclude that transfer is appropriate in this case. With regard to the convenience of parties and witnesses, it appears both districts are about equally convenient—or, perhaps more accurately, equally inconvenient. If the case proceeds in this Court, BRM's employees in San Francisco would be inconvenienced, while if the case is held in the Northern District of California, the plaintiffs would be inconvenienced. Likewise, either district would inconvenience some of the witnesses that are likely to be called. We would guess that the parties will want to call certain employees of the Warrenton Railroad and perhaps

employees at CF's phosphate plant in Florida. For these witnesses, the Northern District of Illinois and the Northern District of California are equally inconvenient. The plaintiffs suggest that they will need to call certain CF management employees, and that CF's offices are located in Long Grove, Illinois. However, BRM correctly points out that the plaintiffs' evidence only shows that CF was in this district five years ago.

Thus, the convenience of parties and witnesses does not favor either district. We conclude, however, that the interests of justice favor transfer in this case. In the management agreement, the parties agreed that California law would apply. The Supreme Court has identified this as a factor to consider in deciding transfer motions:

> There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). While the choice of law provision in the agreement probably obviates any conflict of law problems, retention of this case would require us to delve into the niceties of California commercial law. It is better, all in all, to have this case decided by a federal judge more familiar with California law than we are. *See Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 221 (7th Cir. 1986) ("In a diversity action, it is ... considered advantageous to have federal judges try a case who are familiar with the applicable state law."); *General Accident Insurance Co. v. Travelers Corp.*, 666 F.Supp. 1203, 1207 (N.D.Ill.1987) (Aspen, J.). Accordingly, we will grant BRM's motion to transfer under section 1404(a).

### IV. Conclusion

For the reasons set forth above, BRM motion to dismiss for improper venue is

---

**4.** Section 1404(a) provides

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

denied. Its alternative motion under 28 U.S.C. § 1404(a) to transfer to the Northern District of California is granted. It is so ordered.