**Mark SCHWARTZ, Plaintiff–Appellant,**

**v.**

**ELECTRONIC DATA SYSTEMS, INC., Defendant–Appellee.**

**No. 88–1980.**

United States Court of Appeals, Sixth Circuit.

Argued May 22, 1989.

Decided Sept. 4, 1990.

Robert H. Fortunate (argued), Foster, Meadows & Ballard, Detroit, Mich., for plaintiff-appellant.

J.R. Wheatley, Clark, Hardy, Lewis, Pollard & Page, Birmingham, Mich., George Cherpelis, Timothy Salazar (argued), Cherpelis & Associates, Alburquerque, N.M., for defendant-appellee.

Before: MERRITT, Chief Judge, and NELSON, Circuit Judge, and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

In this diversity action a former employee of Electronic Data Systems, Inc. (EDS) seeks damages for alleged fraudulent misrepresentations concerning the content of a training program for which the plaintiff was hired. He also charges EDS with breach of his employment contract.

I.

The plaintiff, Mark Schwartz, is a citizen of Michigan. EDS, a Texas corporation with its principal place of business in Dallas, is a wholly-owned subsidiary of General Motors Corporation (GM), a Delaware corporation with its principal place of business in Michigan. Although some of the events leading to the plaintiff's employment took place in California, both parties rely on the substantive law of Michigan, and we agree that Michigan law controls.

A.

The plaintiff has a bachelor's degree in electrical engineering from the Massachusetts Institute of Technology and a doctorate in neuro-science from the University of California at Los Angeles. After completing his degree at UCLA, Schwartz stayed on for several years doing research under various grants. In the spring of 1985 the funding for his current research program was running out and he began looking for employment in industry. In the course of his search Schwartz answered an advertisement by EDS in the Los Angeles Times which described in general terms a new training program that EDS had created in which qualified individuals would receive "world class training ... specially designed for engineers who want to advance quickly in a computer technology environment that can only be described as state-of-the-art." The ad went on to state: "Your career will be at the leading edge of technology—in robotics, CAE [Computer Aided Engineering]/CAD [Computer Aided Design]/CAM [Computer Aided Manufacturing]/CIM [Computer Integrated Manufacturing], machine vision, manufacturing control systems, expert systems and simulation systems."

Although Schwartz had many years of computer training and had used computers extensively in research, he had no experience in manufacturing. He was particularly interested in robotics and "artificial intelligence." Schwartz met at least twice with an EDS recruiter, Becky Larkin, who described the Engineering Systems Development Program (the program) in broad terms and gave him some documents describing the program, and the two corporations, EDS and GM. She stated that the program was designed to gain maximum benefits for GM out of its recent "alliance" with EDS.

At the second meeting with Ms. Larkin, Schwartz submitted a formal application for employment by EDS. He had previously furnished a resume. Following that meeting Schwartz was contacted by EDS and invited to come to Detroit for a further interview. Following an interview with Howard Falls at the GM Technical Center near Detroit, Schwartz signed an employment agreement, and other documents, on July 9, 1985. EDS agreed to pay for Schwartz and his family to move to Michigan, and he was to begin work on September 30, 1985, at a salary of $29,000 per year. This was approximately $8,000 more than his stipend at UCLA.

B.

Ms. Larkin furnished a handwritten outline of the program at the first meeting. According to this outline, the program was divided into three phases, and was designed to last 20 to 24 months. Phase I involved

learning the GM engineering/manufacturing environment, the computer tools used in that environment, and working on various simulation and modeling projects. At the conclusion of Phase I, the trainee would be assigned to an area of expertise such as CAD/CAM, artificial intelligence or process control. Phase II was to consist of 15 weeks of classroom instruction, including 8 weeks devoted to the trainee's specialty area. Phase III, which was projected to last 6 to 9 months, was to involve project analysis and programming in the area of the trainee's expertise. The purpose of the training was to apply the trainee's knowledge and experience to the manufacturing environment. According to Schwartz, Ms. Larkin told him that upon graduation a person would be a "full-fledged EDS systems engineer."

In addition to the handwritten summary, Ms. Larkin gave Schwartz a seven-page typed "overview" of the program. The description of the three phases of the program was largely written in the future tense and clearly indicated that changes might be made. ("The format of the ESD Program *presently* includes three phases.... As the format of the program becomes more clearly defined, revisions to this document will be provided.") Schwartz testified by deposition that he relied on the overview—that it "speaks for itself"—in addition to the newspaper advertisement and Ms. Larkin's oral description of the program and her handwritten summary.

### C.

In October, 1985, about two weeks after Schwartz began working in Phase I of the program, an EDS manager, Reeves, called a meeting of about 100 trainees. He advised them that EDS had determined after further consideration to change Phase II of the program. Instead of 15 weeks of classroom work, the trainees would be given ten weeks of further EDS computer training, with an option for continuing education courses from a University of Michigan professor. Schwartz testified that he believed EDS was saying that its objectives for the program remained the same, but that "how they intended to achieve the objective [was] going to change." He testified that he felt some "disquietitude" about the program after the Reeves meeting, but felt that EDS would return to the original format. Nevertheless, when his supervisor offered him an opportunity in November 1985 to leave the program and become a systems engineer for EDS, Schwartz accepted. He continued to work as a systems engineer until he was terminated in early 1987.

### II.

At oral argument the court raised a question concerning subject matter jurisdiction, and requested the parties to file supplemental briefs on this issue. Research and study of the jurisdictional issue has delayed our decision.

The plaintiff, Schwartz, is a citizen and resident of Michigan. While EDS is a Texas corporation, it is a wholly-owned subsidiary of GM, which has its principal place of business in Michigan. The diversity statute states that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business...." 28 U.S.C. § 1332(c)(1). Thus, for diversity purposes GM, the non-party corporate parent of the defendant, is a citizen of Michigan. The question posed is whether EDS should be treated as a separate entity for purposes of federal court jurisdiction, or whether it should be treated as an alter ego of its corporate parent, GM.

### A.

In *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), the Supreme Court was required to determine whether Cudahy, a Maine corporation, could be sued in a federal district court in North Carolina for breach of contract allegedly committed by Cudahy's subsidiary, an Alabama corporation. The parent corporation was not doing business in North Carolina; however, its subsidiary maintained an office in that state and distributed Cudahy products

within North Carolina. The Court stated the question for decision as "whether the corporate separation carefully maintained must be ignored in determining the existence of jurisdiction." *Id.* at 336, 45 S.Ct. at 251.

In affirming the district court's dismissal of the action for lack of jurisdiction, the Court found that the separation of the two corporations, "though perhaps merely formal, was real. It was not pure fiction." *Id.* at 337, 45 S.Ct. at 251–52. Noting that Cudahy owned all the stock of its subsidiary, the Court stated: "But whatever might be other legal consequences of the concentration [of all the subsidiary's stock in one owner], we cannot say that for purposes of jurisdiction, the business of the Alabama corporation in North Carolina became the business of the defendant." *Id.* at 338, 45 S.Ct. at 252.

█ The Supreme Court was not concerned with diversity jurisdiction in *Cannon.* Nevertheless, the principle enunciated there should be applied in any case where federal court jurisdiction depends on the relationship between a corporate parent and its corporate subsidiary. That principle is: When formal separation is maintained between a corporate parent and its corporate subsidiary, federal court jurisdiction over the subsidiary is determined by that corporation's citizenship, not the citizenship of the parent. So far as we can determine, every court of appeals that has considered the question has reached this conclusion.

█ *Topp v. CompAir Inc.*, 814 F.2d 830 (1st Cir.1987), quoted *Moore's Federal Practice* in applying the "general rule" that a "subsidiary corporation which is incorporated as a separate entity from its parent corporation is considered to have its own principal place of business." *Id.* at 835. This rule applies even where the parent owns all the stock of the subsidiary and exercises close control over its operations. Referring to its decision in *Topp,* the court stated in *U.S.I. Properties Corp. v. M.D. Construction Co.*, 860 F.2d 1, 7 (1st Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989), that "even if

the parent corporation exerts a high degree of control through ownership or otherwise, and even if the separateness is perhaps only formal, the subsidiary's place of business is controlling for diversity purposes if the corporate separation is real and carefully maintained."

The court reached the same conclusion in *Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140 (3d Cir.1972). In *Quaker State* the plaintiff sought to have a subsidiary treated as nothing more than an agent of its corporate parent. Since the subsidiary and the plaintiff were both citizens of Pennsylvania, complete diversity would exist only if the subsidiary's separate corporate citizenship were ignored and it could be treated as having the same citizenship as its corporate parent. Applying the rule that we adopt in this case, the court of appeals affirmed the district court's dismissal of the action for lack of jurisdiction. Though the corporate parent exerted a high degree of control over the subsidiary, the court found that the separate citizenship of the subsidiary determined the question of jurisdiction.

In *J.A. Olson Co. v. City of Winona, Mississippi,* 818 F.2d 401 (5th Cir.1987), the plaintiff, an Illinois corporation with its only manufacturing plant in Mississippi, sued a Mississippi city in a federal court in that state. Upon finding that Mississippi was the plaintiff corporation's principal place of business, the district court dismissed for lack of jurisdiction. In affirming, the court of appeals rejected the argument of the plaintiff that as a subsidiary of another Illinois corporation, it was merely an alter ego of its corporate parent. When a subsidiary chooses to be incorporated separately from its parent, for whatever reason, it is treated as an independent entity for purposes of determining federal court jurisdiction. *Id.* at 414.

B.

Cases that have found the corporate parent's citizenship to control have not rejected the "general rule." Rather, in those cases the courts have determined on the

basis of particular facts that a subsidiary's principal place of business was the same as that of the corporate parent, *Toms v. Country Quality Meats, Inc.*, 610 F.2d 313 (5th Cir.1980), or that the subsidiaries were not actually separate corporate entities, *Frazier v. Alabama Motor Club, Inc.*, 349 F.2d 456, 460 (5th Cir.1965).

Nor do we believe that *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280 (7th Cir.1986), requires a different conclusion. That case did not deal with a corporate parent and its subsidiary. The issue was the citizenship of a *division* of a corporation. The court held that the state of which a division of a corporation is a citizen for the purpose of determining diversity "is the state of which the corporation that owns the division is a citizen." *Id.* at 1282. A division of a corporation does not possess the formal separateness upon which the general rule is based, and thus is not an independent entity for jurisdictional purposes.

There is no dispute that GM is a citizen of Michigan under section 1332. But GM is not a defendant in this action. EDS is a citizen of Texas under section 1332, and nothing in the record would support a finding that EDS is not, formally, a separate corporation, though it is wholly owned by GM. We conclude that the district court had jurisdiction over this case under the diversity statute.

### C.

Chief Judge Merritt's dissent has a certain appeal, not least of all because it would tend to reduce diversity cases. We believe, however, that desirable as such a result might be for the federal courts, such changes in jurisdiction are to be made by Congress. Congress recognized the need to restrict the availability of diversity jurisdiction to corporations when it enacted the 1958 amendment to section 1332. That amendment invested multi-state corporations with dual citizenship—a corporation must be treated as a citizen both of its state of incorporation and of the state of its principal place of business. It may be that the next logical step in limiting the avail-

ability of diversity jurisdiction to corporations at a time when so many large firms operate through numerous subsidiaries and are the progenitors of corporate "children" to second and third generations is the adoption of the rule that the dissent proposes. As we see it, however, that is not the law today.

### III.

In granting summary judgment for EDS the district court found on undisputed facts that the representations made to Schwartz were not essentially false and were not made with reckless disregard for their truth or with any knowledge of their falsity. Thus, the court held, the plaintiff failed to produce evidence of the basic element of a cause of action for fraud. The recruiter, Becky Larkin, and the documents in Schwartz's possession described a new program as it was then planned. Nothing indicated that EDS used trickery or a misrepresentation of the actual plans of the company in recruiting Schwartz. Although EDS adhered to the same goal of training people to meet GM's needs, it changed the program, particularly Phase II. The plaintiff was dissatisfied because he felt that the change in Phase II rendered it a much lower level of training than he had anticipated and desired.

### A.

■ We agree with the district court that Schwartz failed to produce evidence of fraud sufficient to avoid summary judgment. As we have noted, the program was new and the printed materials specifically advised that they described the program as it was *presently* designed and that as it became more clearly defined, revisions would be provided. Schwartz testified that he did not get the impression from Ms. Larkin that anything was "set in stone." He stated that Howard Falls told him nothing different from Ms. Larkin's information. Nevertheless, he felt, for some unexplained reason, that EDS never intended to offer "state-of-the-art" world class training. Nothing in the record supports this conclusion. Schwartz conducted extensive

discovery and makes no complaint on appeal that he was denied an opportunity to meet the requirements of Fed.R.Civ.P. 56.

When Reeves announced the program changes, he gave business reasons. He stated that the final design of the program was the end result of an evaluation process. The decision was related to the known needs of GM and the cost and availability of various methods of satisfying those needs. The record reflects an investigation by EDS into the availability of classroom training at leading universities, and its costs, and supports the defendant's assertions that Phase II was changed for business reasons, and not because EDS never contemplated offering classroom training.

Schwartz knew from the first contact with Ms. Larkin that the program was new and that it was subject to revision. The fact that the changes in Phase II particularly disappointed him did not demonstrate that EDS had fraudulently misrepresented the program. Of course, Schwartz never entered Phase II, but quit the program after about six weeks in Phase I. There were no significant changes in Phase I, yet he did not persevere even to the end of that portion of the program, much less give Phase II a try to determine what value it might have for him. Finally, EDS promoted Schwartz to systems engineer immediately after he left the program in Phase I, the very position he would have attained if he had completed the program successfully.

■ With one exception that will be discussed later, Michigan adheres to the general rule that six elements of actionable fraud or misrepresentation must be proved by clear and convincing evidence. The elements, all of which must be found to exist, were set forth in *Candler v. Heigho*, 208 Mich. 115, 121, 175 N.W. 141 (1919), and repeated more recently in *Hi–Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813 (1976):

> The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when

he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

Our rather lengthy recitation of the undisputed facts, as opposed to the plaintiff's unsupported assumptions, makes it clear that Schwartz failed to produce evidence in response to the motion for summary judgment that would satisfy his burden under Michigan law, Fed.R.Civ.P. 56 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### B.

■ As an exception to the usual requirements of an action for fraud, Michigan recognizes the "innocent misrepresentation" doctrine, which permits recovery of damages for a misrepresentation of fact, though made innocently, if the consequences to the plaintiff are the same "as though it had proceeded from a vicious purpose...." *U.S. Fidelity & Guaranty v. Black*, 412 Mich. 99, 115, 313 N.W.2d 77 (1981) (quoting *Holcomb v. Noble*, 69 Mich. 396, 399, 15 N.W. 129 (1888)). Application of the innocent misrepresentation rule is limited to cases where the misrepresentation is made in connection with a contract. Not only must the plaintiff in such a case show that he has suffered an injury; he must also show that the injury inures to the misrepresenter's benefit. 412 Mich. at 118, 313 N.W.2d 77.

■ Schwartz failed to produce evidence in support of a claim for damages for innocent misrepresentation. His expectations concerning his future with EDS were based on his subjective evaluation of a portion of

Phase II (15 weeks of classroom work) as the most significant feature of the program. Yet, the entire program was presented as a new approach that was subject to revisions. When EDS changed the program in a way that made it less appealing to Schwartz, he was offered and accepted appointment as a systems engineer, the very position he would have attained upon successfully completing the program. In addition to identifying no misrepresentation, he failed to demonstrate either that he suffered an injury or that the injury inured to the benefit of EDS.

### C.

■ Schwartz also sought damages for breach of contract. He contends that EDS breached his employment agreement by failing to provide the training it had promised. He did not sue for wrongful discharge, and his ultimate termination by EDS is not an issue.

Schwartz signed an employment agreement with EDS under which he agreed to "assume responsibilities as ESD PHASE I" effective September 30, 1985 at a salary of $29,000· per year. He began working in Phase I at that time and was paid the agreed salary. When *changes in Phase II* were announced, he became dissatisfied with his prospects under the program, and though he had not even completed Phase I he was permitted to transfer immediately to the position of systems engineer. His chief complaint appears to be that the changes in the program reduced it to the level of another training program known as SED. Yet, one of the documents that Schwartz provided at his deposition to support his claims stated: "The ESD program, like the SED program, culminates when a candidate is named a systems engineer." The employment agreement mentioned no particular training, but merely provided for Schwartz's at-will employment as "ESD PHASE I." The plaintiff produced absolutely no evidence in support of his claim that EDS breached this contract.

The judgment of the district court is affirmed.

MERRITT, Chief Judge, dissenting.

Because in my view the parties are not diverse within the meaning of 28 U.S.C. § 1332(a)(1), (c)(1) (1982),[1] the case should be dismissed for lack of subject matter jurisdiction. *See* Fed.R.Civ.P. 12(h)(3) (1982).[2] I therefore respectfully dissent from the Court's opinion.

Neither the Supreme Court nor our Court has considered whether a wholly owned subsidiary may be subject to suit in a federal court action in the plaintiff's home state, the state in which the defendant's parent corporation maintains its principal place of business. Other courts of appeals that have considered the question have not seriously analyzed it. For purposes of defining diversity jurisdiction, some courts have assumed the applicability in the jurisdictional context of the general principle of corporate law that a parent and its subsidiaries should be viewed as separate from each other for purposes of liability. Absent any justification for applying by analogy a doctrine designed only to limit the liability of individual and corporate investors in order to promote the formation of capital in our free-market economy, there is no reason this doctrine should control corporate citizenship for purposes of diversity jurisdiction. After considering the historical basis of diversity jurisdiction, the quite different policies underlying the law of limited liability for corporate shareholders, the relevant precedents from other courts of appeals, as well as the law of personal jurisdiction, I believe that General Motors and its divisions and subsidiaries should be viewed as a whole and that EDS, a wholly owned subsidiary, is, for purposes of diversity jurisdiction, a citizen of its

---

**1.** Diversity jurisdiction exists in actions "between ... citizens of different states" and "a corporation shall be deemed to be a citizen of [its state of incorporation] ... and the State where it has its principal place of business...." 28 U.S.C. § 1332(a)(1), (c)(1).

**2.** Rule 12(h)(3) states:
> Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.

Fed.R.Civ.P. 12(h)(3) (1982).

state of incorporation and principal place of business as well as a citizen of its parent corporation's state of incorporation and principal place of business. Thus the parties in this case are not diverse within the meaning of 28 U.S.C. § 1332(a)(1), (c)(1) (1982).

### I.

This inquiry into the relationship of parent and subsidiary corporations for jurisdictional purposes should begin with a review of the historical basis of diversity jurisdiction. Both Article III and the First Judiciary Act granted federal courts concurrent jurisdiction over suits "between Citizens of different states."[3] The framers and the First Congress intended to provide a tribunal in which a foreigner or citizen of another state might have the law administered free from the local prejudices or passions which might prevail in a state court against them as "outsiders." *Burgess v. Seligman*, 107 U.S. 20, 34, 27 L.Ed. 359 (1883); *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat) 304, 347, 4 L.Ed. 97 (1816); *Bank of the United States v. Deveaux*, 9 U.S. (5 Cranch) 61, 87, 3 L.Ed. 38 (1809); *see* Moore & Weckstein, *Diversity Jurisdiction: Past, Present, and Future*, 43 Tex.L. Rev. 1, 15 (1964). There is no trace of any other reason for diversity than "home-cooking" to be found in the arguments of the framers made in 1787–1789. *See* Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv.L.Rev. 49 (1923).[4] The "citizens" who benefitted from the protections of diversity jurisdiction were out-of-state and foreign businesses and corporations, who, as lenders, suppliers, purchasers, or other types of creditors under private contracts, sought to invest capital or do business in a state's commerce but feared costly reprisals from debtor-oriented state tribunals. *See Ogden v. Saunders*, 25 U.S. 213, 270, 365–67 (1827); Taft, *Possible and Needed Reforms in Administration of Justice in Federal Courts*, 8 A.B.A.J. 601, 604 (1922) (courts must appear fair to those considering investing their capital in states where needed for commercial progress).[5]

3. U.S. Const. art. III, § 2. The wording of the Judiciary Act of 1789 was slightly different. There, Congress gave federal circuit courts concurrent jurisdiction over suits "between a citizen of the State where the suit is brought, and a citizen of another State." Act of Sept. 24, 1789, § 11, 1 Stat. 73, 78. The 1789 Act was amended in 1875 to read: "[cases] in which there shall be a controversy between citizens of different States...." Act of March 3, 1875, § 1, 18 Stat. 470. The Revised Judicial Code of 1948 retained the language granting "citizens of different states" access to federal courts. *See* 28 U.S.C. § 1332(a)(1).

4. Other bases have been suggested, none of which informed either the constitutional or congressional provisions for diversity jurisdiction. *See, e.g.,* Moore & Weckstein, *Corporations and Diversity of Citizenship Jurisdiction: A Supreme Court Fiction Revisited*, 77 Harv.L.Rev. 1426, 1449 (1964) (because of better pleading practice and pretrial and trial procedures, administration in federal system assures tort and contract litigants that their cases will not be decided on some procedural technicality unique to state law). *Cf.* H. Friendly, *Federal Jurisdiction: A General View* 144 (1973) (it is a myth that "diversity jurisdiction was needed to prevent inferior federal judges from becoming narrow technicians, mired in the intricacies of [federal law]...."). Judge Friendly also noted that whatever judicial education might be derived from a state-federal partnership in developing the common law is better served by concurrent jurisdiction than by federal judges' approximations of what a state's highest court would do in a given case. *Id.* at 145. Diversity jurisdiction also has been credited with stimulating out-of-state investment, *see* Moore & Weckstein, *Diversity Jurisdiction: Past, Present, and Future*, 43 Tex.L.Rev. 1, 16–17 (1964), but studies have shown otherwise. *See, e.g.,* ALI, *Study of the Division Between State and Federal Courts*, 105–06 & n. 10 (1968) (quality of courts in a prospective new location is insignificant factor in business decision whether to enter or relocate in a new place). Finally, "although lawyers [and their clients] will always prefer an arrangement that gives them a choice of forum," that alone "is not a justifiable reason for continuing the system." *See* Federal Diversity of Citizenship Jurisdiction: Hearings on S. 2094, S. 2389 and H.R. 9622 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary, 95th Cong., 2d Sess. 74–75 (1978) (statement of Daniel J. Meador, Assistant Attorney General, U.S. Dep't of Justice).

5. Given that the sole purpose behind diversity jurisdiction was to protect out-of-state defendants from local bias, that purpose is not served by permitting a plaintiff to sue in federal district court in his home state. An in-state plain-

Recognizing the flood of diversity cases accompanying the boom in corporate litigation, Congress in 1958 amended the diversity provision to expand the notion of corporate citizenship. The amendment was designed to eliminate from federal district courts many of the cases in which the policies underscoring diversity jurisdiction are not met. *See Freeman v. Northwest Acceptance Corp.*, 754 F.2d 553, 558 (5th Cir.1985); S.Rep. No. 1830, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Admin.News 3099, 3102 (federal diversity jurisdiction "was never intended to extend to local corporations which, because of a legal fiction, are considered citizens of another State."). Before 1958, a corporation was deemed a citizen only of its state of incorporation. After the amendment, a corporation was considered a citizen not only of its state of incorporation, but also of the state of its principal place of business. *See* 28 U.S.C. § 1332(c) (1958).

The 1958 amendment's legislative history does not mention "subsidiary" corporations, but treats for purposes of diversity jurisdiction all large-scale businesses, whether doing business through divisions or subsidiaries, as a whole, *i.e.*, as one unit:

> [T]hose corporations which do business over a large number of States, such as the railroads, insurance companies, and other corporations whose businesses are not localized in one particular State ... would be regarded as a citizen of that one of the States in which was located its principal place of business.

*See* S.Rep. No. 1830, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Admin.News 3102. Attempts to resolve the ambiguous history of the amendment have led some to suggest that the amendment

may have envisioned a principal place of business for each subsidiary corporation, treating them as completely separate from their parent, even though the legislative history speaks of the large-scale business as one entity. *See, e.g.,* P. Bator, D. Meltzer, P. Mishkin & D. Shapiro, *Hart and Wechsler's The Federal Courts and The Federal System,* 1673 n. 3 (3d ed. 1980). For three reasons I disagree with such a separatist interpretation of the legislative history.

First, neither the quoted passage nor the balance of the legislative history addresses directly the jurisdictional question raised by parent-subsidiary relationships. There is no evidence that Congress contemplated the situation in which a subsidiary corporation would be a named defendant in a suit in which the parent corporation is a nonparty, and in which, for jurisdictional purposes, the *wholly owned* subsidiary would be considered *wholly independent* from its parent. It is understandable that Congress may have overlooked the then-infrequently used fiction by which corporations, through stock purchases, not only "do business over a large number of States," but own multiple separate subsidiaries over a large number of states as well.

Beginning shortly after the 1958 amendment to § 1332(c), a significant portion of business assets have come to be held not by corporations whose stock is principally held by individual investors, but by subsidiaries who are the corporate children and grandchildren of parent holding companies. *See* M. Eisenberg, *The Structure of the Corporation* 277 (1976). These subsidiaries are found in all economic sectors, and in some, such as the commercial banking, in-

tiff is presumed to receive fair treatment in actions before his home-state tribunals. Congress adopted this presumption when it enacted the removal statute, 28 U.S.C. § 1441(b), under which a diversity action is "removable only if none of the ... defendants is a citizen of the State in which such action is brought." Although no persuasive rationale has been offered to support an in-state plaintiff's right to bring a diversity action, any doubt over whether the meaning of "citizens of different states" extends to in-state plaintiffs was resolved by the language italicized below in the current version of

the venue statute, which makes venue in diversity cases proper "in the judicial district *where all plaintiffs* or all defendants *reside,* or in which the claim arose." 28 U.S.C.A. § 1391(a) (Supp. 1990) (emphasis added). A federal-question plaintiff, on the other hand, is restricted to bringing suit in the district where all defendants reside or where the claim arose. 28 U.S.C.A. § 1391(b) (Supp.1990). For better or for worse, that language of the venue statute—whether it was actually intended to do so or not—must be read to include in-state plaintiffs within the phrase "citizens of different states."

surance, railroad, communications, and securities industries, they have become the dominant form of business organization. *Id.* at 277–79. All but a handful of corporations were independent, freestanding corporations as late as the mid–1950's, and most were independent as late as the mid–1960's. In short, at the time of the 1958 amendment, the conglomerate movement of the 1960's, and the take-over movement of the 1980's had yet to produce today's structure under which subsidiary corporations have become the norm.

Second, to the extent that Congress considered subsidiary corporations in the 1958 amendment, if in fact it did so at all, it was only to determine how the fact of ownership would affect judicial determination of a *parent* corporation's principal place of business, not a subsidiary's. Congress expressly directed its attention to "railroads, insurance companies, and other corporations" which do business through affiliates, either in the form of branch offices, divisions, or corporate subsidiaries. For purposes of diversity jurisdiction, these far-flung enterprises were to be viewed as one economic entity, thus avoiding the confusion of pinpointing the situs of a corporation that in effect is many places at once. Rather than viewing parent corporations and their subsidiaries in accordance with the separatist, substantive law of corporate liability, Congress determined that in a jurisdictional context the fact of ownership in widespread corporate operations warranted treating the entire operation as an economic whole.

As a result, Congress, if in fact it specifically considered the jurisdictional question raised by the existence of subsidiaries, must have intended that a parent corporation's principal place of business in one state be imputed to its subsidiary in another state, thus giving the subsidiary two principal places of business. Any other view ignores the realities of the law of personal jurisdiction and corporate liability, which normally permit a plaintiff to obtain jurisdiction over and obtain a judgment against a corporate subsidiary without joining its parent. So long as these realities of corporate law remain, it would undermine the purpose of federal diversity jurisdiction to allow diversity jurisdiction in a state where the subsidiary maintains its headquarters but where its parent does not. Otherwise, a plaintiff of state A suing a subsidiary who claims state A as its principal place of business would be diverse from the defendant simply because the parent corporation is incorporated and maintains its principal place of business in state B. Only a view under which a subsidiary maintains its own principal place of business in addition to its parent's can the 1958 amendment to § 1332(c) be interpreted to avoid the untenable result of permitting federal jurisdiction in such an action of entirely local character.

Third, the amendment's overriding purpose should not be forgotten in our attempt to discern Congress's understanding of what "principal place of business" means. In the same report quoted above, the Senate conveyed its wish that the amendment reduce the case load of federal courts and to remedy abuses of diversity jurisdiction. *See* S.Rep. No. 1830, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Admin.News 3099, 3103 (statistics indicated the amendment would eliminate 3.6 to 23.5% of diversity cases); *see also* Federal Judicial Center, *The Budgetary Impact of Possible Changes in Diversity Jurisdiction* 4–5, 27–35 (1988) (suggesting amendments to corporate citizenship or outright elimination of in-state plaintiff diversity jurisdiction which would eliminate over 40% of diversity cases from original federal jurisdiction). According to the Senate report, the former statute had "given rise to the evil whereby a local institution ... is enabled to bring its litigation into the Federal courts simply because it has obtained a corporate charter from another State." S.Rep. No. 1830, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Admin. News 3099, 3101–3102. This consequence was considered unfair both to corporations chartered and operating locally and to local individual citizens who were denied the choice of federal or state forums. *See* Joiner, *Corporations As Citizens of Every State Where They Do Business: A Needed*

*Change in Diversity Jurisdiction,* 70 Judicature 291, 291 (1987); Moore & Weckstein, *Corporations and Diversity of Citizenship Jurisdiction: A Supreme Court Fiction Revisited,* 77 Harv.L.Rev. 1426, 1432 (1964). Consequently, if the sole purpose of diversity jurisdiction is to provide a forum free from prejudice against outsiders, then no reason recommends viewing a business that is wholly owned by a local business as any less "local" than its owner.[6]

## II.

To import by analogy the principles of one area of law, *i.e.,* principles of limited liability of parent and subsidiary corporations, to another area of law, *i.e.,* diversity jurisdiction, requires that the analogy be appropriate. Evaluating the propriety of borrowing separatist principles of the substantive corporate law of limited liability—the judicial method followed by our Court and some other courts in these cases—first requires an assessment of the policies underlying that field of law.

Corporations are the dominant form of business organization because they offer investors the opportunity to reap substantial profits and to gain the protection of limited liability. Limited liability means that the investors in the corporation are not liable for more than the amount they invest. It encourages capital formation and the entry of more competitors into the marketplace, thus encouraging competition. This incentive exists because the investor is assured that his loss cannot exceed his investment. *See* Easterbrook & Fischel, *Limited Liability and the Corporation,* 52 U.Chi.L.Rev. 89, 89–90, 98 (1985); R. Clark, *Corporate Law* §§ 1.1–.2, at 1–10 (1986). Without the protection of limited liability, competition would suffer because investment would decline, particularly among the dominant groups of well-off in-

vestors who are reluctant to put their entire capital at risk with each investment. *See* Posner, *The Rights of Creditors of Affiliated Corporations,* 43 U.Chi.L.Rev. 499, 502 (1976).

Under this model of corporate liability, the corporation is considered a legal entity distinct from its shareholders until that entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime. In those circumstances, the law regards the corporation as an association of persons who then are stripped of the protections of limited liability. W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 41, at 388–89 (1983). The corporate entity also may be disregarded or equitably "pierced" when it is the mere "alter ego" or business conduit of a person or persons. The "alter ego" doctrine holds liable any individual who uses a corporation merely as an instrumentality to conduct his own business. In such instances, liability arises from the injustice to third parties dealing with an undercapitalized corporation. *Id.* at § 41.10, at 397. A plaintiff invoking the amorphous "alter ego" doctrine must show that the separate personalities of the corporation and the individual should be merged. Mere domination and control of the corporation by the principal or sole stockholder, who may be a corporation, does not "without more" make the stockholder personally liable for the acts of the corporation. *Id.* at § 41.10, at 397–98.

When, as here, the principal stockholder is a corporation, courts evaluate the level of domination that the parent corporation exerts on the subsidiary, which must be very high before the "alter ego" doctrine applies. Absent an "alter ego" relationship, the law extends to corporate shareholders the same protections of limited liability extended to individual shareholders for the same reasons: to encourage invest-

---

**6.** In fact, only six years after the 1958 amendment to § 1332(c), Congress again amended that provision by expanding the notion of corporate citizenship for insurance companies to include, in addition to its own dual citizenship, the citizenship of its nonparty insured when the insurer is sued by a plaintiff injured in a state that permits direct actions by third parties against

insurers. *See* 28 U.S.C. § 1332(c)(1) (1964). In addition, Congress has increased the minimum amount in controversy several times since the inception of diversity jurisdiction, resulting in further narrowing the access of diversity litigants to the federal courts. *See, e.g.,* 28 U.S.C. § 1332(b) (1988) (raising minimum amount in controversy from $10,000 to $50,000).

ment which, in turn, stimulates the economy and enhances competition.

There are several reasons for a corporation to diversify by taking on subsidiaries which, as here, are engaged in seemingly unrelated businesses. The owners may seek to take advantage of managerial or financial economies, or seek to reduce risk through diversification, or to increase shareholder profit by using funds otherwise earmarked for dividends for internal expansion into an unrelated line of business. Diversification rather than distribution of dividends also would create tax savings for shareholders. *See* Posner, *The Rights of Creditors of Affiliated Corporations*, 43 U.Chi.L.Rev. 499, 510 & n. 23 (1976).

Although strong arguments have been made for both sides on whether a parent corporation should be made liable for its subsidiary's debts, those arguments, like the reasons underlying a corporation's decision to form or purchase a subsidiary, are completely unrelated to whether the parent-subsidiary relationship should have jurisdictional consequences. A corporation's decision to purchase the stock of another corporation is not normally based on its options among courthouses in which to litigate.

Because corporate investment decisions are not normally guided by speculation about where its litigation will take place, the fortuity of which form of business organization a corporation chooses for its wholly owned entities should not dictate which litigants are entitled to a federal forum and which are not. The pro-competition policy relating to limited corporate liability for subsidiaries is not sufficiently related to the "home-cooking" policy of diversity jurisdiction to justify importing the law of separate corporate liability into the definition of diversity jurisdiction. *See Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1282 (7th Cir.1986) ("Although a division may, if state law permits, sue and be sued in its own name ... the state of which it is a citizen for purposes of determining diversity is the state of which the corporation that owns the division is a citizen."); *cf. Carden v. Arkoma Assocs.*, —— U.S. ——, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990) (Court resists extending citizenship to artificial entities other than corporations).

Although corporate decisions whether to purchase the stock of another corporation do have legal consequences from tax and substantive liability standpoints, the policies that shape those areas of law should not dictate decisions about diversity jurisdiction. To create diversity jurisdiction—in this case by importing from the law of corporate liability the separatist fiction that parent and subsidiary are legally distinct entities—would make sense only upon a showing that the subsidiary may suffer "home-cooking" in the parent's home state, *i.e.*, some additional bias above and beyond that which may be experienced by corporations generally. It is my belief that no such bias pervades state court tribunals deciding cases involving wholly owned subsidiaries of in-state corporations. The identity of economic interest of parent and subsidiary is obvious. The success of one flows directly to the benefit of the other, just as the failure of one impairs the continued success of the other.

The interests underlying diversity jurisdiction are better served by precluding a subsidiary or a plaintiff suing that subsidiary from entering federal court on the ground that the identity of interest between parent and subsidiary should be ignored jurisdictionally merely because in many cases it is ignored in the unrelated liability context. Congress did not import the separatist policy of corporate liability into its 1958 amendments to the diversity statute. Rather, it viewed the large-scale business enterprise as a whole.

### III.

Although neither the diversity clause nor its legislative history suggest that the fiction of corporate separateness of parent and subsidiary be maintained in the context of diversity jurisdiction, several courts of appeals and several commentators, by borrowing principles of corporate limited liability, have suggested that result. Of those

courts of appeals which have imported the corporate liability fiction to this context, however, only two, the First and Third Circuits, have used the "alter ego" doctrine to disregard corporate separateness and attribute to a subsidiary the citizenship of its parent corporation. *See U.S.I. Properties Corp. v. M.D. Constr. Co.*, 860 F.2d 1 (1st Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989); *Topp v. CompAir, Inc.*, 814 F.2d 830 (1st Cir.1987); *Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1142 (3d Cir.1972); *Carnera v. Lancaster Chem. Corp.*, 387 F.2d 946 (3d Cir.1967), *cert. denied,* 390 U.S. 1027, 88 S.Ct. 1418, 20 L.Ed.2d 285 (1968). Neither those courts nor the several commentators who also have accepted that view have made any effort to analyze the jurisdictional question in light of the policies presented here concerning the distinct bases of diversity jurisdiction and principles of limited liability. *See* 1 *Moore's Federal Practice* ¶ 0.77 [1.–2], at 717.10 (1990);[7] 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* § 3625, at 635–36 (1984).[8]

On facts generally analogous to those before us, the First and Third Circuits have published decisions that conflict with the rule I suggest here. Of the four opinions in point, two were decided by the Third Circuit and incorporate the "alter ego" doctrine without any attempt to justify its applicability to a diversity jurisdiction context. *See Quaker State,* 461 F.2d at 1142 (in tort action against parent and subsidiary, court declined to impute parent's principal place of business to subsidiary because subsidiary "maintain[ed] its separate corporate identity"); *Carnera,* 387 F.2d at 947 n. 2 ("Cases dealing with the principal place of business of a subsidiary which does business with its parent have looked to the specific business done by each corporation in determining the principal place of business of each corporation.") (citations omitted). These cases simply import into the jurisdictional context the separateness doctrine of corporate liability. No effort is made to explain why or to analyze the policies behind diversity jurisdiction.

Only once has a court considered the issue before us in any detail. Even then it was without regard to the distinct policies underlying diversity jurisdiction and corporate liability. In *Topp v. CompAir Inc.,* 814 F.2d 830 (1st Cir.1987), the First Circuit adopted a test that conflated the "alter ego" doctrine with the "nerve center" test in determining the citizenship of a subsidiary corporation. The court invoked that test to decide whether the separate identities of parent and subsidiary should be maintained. After a detailed analysis which considered, *inter alia,* business records, the distribution of responsibilities among employees and managers, and the benefit that both entities received from borrowing and lending money to each other at preferred rates, the court elected to preserve the distinct corporate identities of parent and subsidiary for jurisdictional purposes:

> [T]he nerve center test does not search for the locus of its parent corporation,

---

**7.** Treatment of the issue in *Moore's* is limited to the following:

> A subsidiary corporation which is incorporated as a separate entity from its parent corporation is considered to have its own principal place of business; and, accordingly, may possess dual citizenship if such place is located in a different state from that in which it is chartered.

1 *Moore's Federal Practice* ¶ 0.77[1.–2], at 717.-10 (1990) (footnote omitted).

**8.** Professors Wright, Miller and Cooper offer the following brief discussion of the topic:

> The general rule in this situation is that a subsidiary corporation has its own principal place of business for purposes of diversity jurisdiction, unless it is merely an "alter ego" or agent of the parent corporation. However, if the parent corporation is involved in an action, its activities may be merged with those of its subsidiaries in determining the principal place of business. Whether a subsidiary is a separate entity is a question of fact, and courts consider such matters as the degree of control by the parent corporation, the relationship of the activities of the subsidiary to the activities of the parent, the membership of the board of directors, and maintenance of separate corporate books.

13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* § 3625, at 635–36 (1984) (footnotes omitted).

nor of those having the ultimate controlling interests. [It] ... does not search out the home of the economic tsar who ultimately dominates, through other corporations or otherwise, the entity in question. Rather, so long as the entity's corporate form is entitled to credibility, the nerve center test looks for the localized nerve center from which the corporation in issue is directly run.

*Id.* at 835.

This view fails to explain why the "nerve center test," which, in the court's view, merges with the "alter ego" doctrine except in cases where "the entity's corporate form is entitled to credibility," is applicable here. The court gave no reason for allowing the "nerve center" test and "alter ego" doctrine to control the jurisdictional consequences of a parent-subsidiary relationship. The First Circuit went on to say only that otherwise, "every independently incorporated, wholly owned subsidiary which is part of a large conglomerate would be treated (for diversity jurisdiction purposes) as a mere division of a large company rather than a separate corporation." *Id.* The court declined to permit "the fact that a parent corporation exercises the control which is necessarily incident to the full ownership of its subsidiary" to cause it to overlook the formal separation of the two entities. *Id.* at 837.

I find no court decision that analyzes the issue in terms of the policies underlying diversity jurisdiction or in terms of the legislative history behind the 1958 Act, which views large-scale corporate businesses as a whole rather than as separate unrelated units. No policy underlying diversity jurisdiction requires that two entities operating under one owner receive the protections designed to insulate out-of-staters from judicial bias. There is no reason to think that EDS, or any other subdivision of General Motors, whether incorporated as a subsidiary or maintained as an unincorporated division of GM, will be treated better or worse in the state courts of Michigan than would GM.

One further point is worth mentioning on the current state of the case law of diversity jurisdiction respecting the parent-subsid-

iary problem: Although my research discloses no other cases directly in point, the Fifth Circuit has broached the issue in the reverse situation. *See Freeman v. Northwest Acceptance Corp.*, 754 F.2d 553, 556–57 (5th Cir.1985) (using the alter ego doctrine in *reverse*, court attributed nonparty subsidiary's citizenship to parent corporation and thus found parties nondiverse); *Toms v. Country Quality Meats, Inc.*, 610 F.2d 313 (5th Cir.1980) (finding parties were diverse by imputing parent's citizenship to subsidiary where former exercised actual control over latter). In *Freeman* and *Toms*, the Fifth Circuit addressed whether the parent-subsidiary relationship allows the subsidiary's citizenship to be attributed to its parent corporation. The related question of whether the "home-cooking" policies underlying diversity would attribute a subsidiary's place of business to its parent is not before us and thus can be left to another day.

Other Fifth Circuit decisions, although they assume the applicability to diversity of the amorphous "alter ego" doctrine, have expressly allowed the use of the doctrine as a tool to destroy diversity, not to create it. These decisions are based on a recognition that Congress intended to expand notions of citizenship in order to limit access to federal courts in diversity cases. *See J.A. Olson Co. v. City of Winona*, 818 F.2d 401, 413 (5th Cir.1987) (when nondiverse plaintiff-subsidiary argued it was "alter ego" of diverse nonparty-parent corporation, court held "the alter ego doctrine cannot be used to preserve diversity jurisdiction," and thus declined to impute parent's principal place of business to subsidiary) (quoting *Panalpina Welttransport GMBH v. Geosource, Inc.*, 764 F.2d 352, 354 (5th Cir.1985) (multiple places of incorporation, principal place of business, and alter ego or consolidation doctrines may make corporation citizen of several places for jurisdictional purposes, consistent with congressional intent to constrict availability of diversity)). The notion that plaintiffs "cannot ... pick and choose among the places of citizenship ignoring one or more in an effort to preserve diversity jurisdiction," *Panalpina*, 764 F.2d at 354, has been followed by the Eleventh Circuit in an analogous situation. *See*

294

*Fritz v. American Home Shield Corp.*, 751 F.2d 1152 (11th Cir.1985) (rejecting plaintiff's argument that diverse defendant-parent corporation's place of incorporation should be imputed to nondiverse defendant-subsidiary and holding that complete diversity did not exist).

In addition to the reasoning offered above, the rule attributing a parent's citizenship to its wholly owned subsidiary finds further support from a judicial-economy standpoint. Unlike the "agency" or "alter ego" approaches, which involve extensive factual determinations of a parent's level of dominance exerted over its subsidiary, *see, e.g., Topp v. CompAir, Inc.*, 814 F.2d 830 (1st Cir.1987); *Reed v. Brae Railcar Management, Inc.*, 727 F.Supp. 376 (N.D.Ill.1989), under my view either there is subject matter jurisdiction or there is not. By attributing a parent's citizenship to its wholly owned subsidiary, litigants and reviewing courts thus can avoid detailed inquiries into which entity—parent or subsidiary—is the repository of "control," "decisionmaking," or "day-to-day management" of the subsidiary's affairs.

## IV.

Personal jurisdiction in Michigan over EDS is conceded by the parties, but general principles of personal jurisdiction also support the position that a parent's principal place of business should be attributed to its subsidiary for purposes of diversity jurisdiction. Although the policies underlying personal and diversity jurisdiction are not the same,[9] it is interesting to note that personal jurisdiction cases from our Circuit and elsewhere say that a subsidiary's principal place of business is an important factor in establishing personal jurisdiction over its parent. *See, e.g., Third Nat'l Bank v. Wedge Group, Inc.*, 882 F.2d 1087, 1090 n. 1 (6th Cir.1989) (parent-subsidiary relationship a "contact or factor to be con-

sidered") (quoting *Velandra v. Regie Nationale des Usines Renault*, 336 F.2d 292, 297 (6th Cir.1964)), *cert. denied,* —— U.S. ——, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990); *Donatelli v. National Hockey League*, 893 F.2d 459, 465–66 (1st Cir.1990) ("agency" relationship between parent and subsidiary a factor in establishing personal jurisdiction). *But see Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1363 (5th Cir.1990) ("Although the mere existence of a parent-subsidiary relationship will not support the assertion of [personal] jurisdiction over a foreign parent, there may be instances in which the parent so dominates the subsidiary that 'they do not in reality constitute separate and distinct corporate entities.' ") (citation omitted). Although the home of the subsidiary or the parent is not necessarily determinative of personal jurisdiction of its affiliate, "minimum contact" analysis under the due process clause since *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), counts the principal place of business of one affiliate as a major factor in determining whether for purposes of personal jurisdiction its corporate relative is subject to suit in a particular state. See the well-reasoned district court opinions in *Meyers v. Asics Corp.*, 711 F.Supp. 1001, 1004 (C.D. Cal.1989) ("the wholly owned subsidiary was a mere part of an overall marketing plan, which purposely availed itself of the privilege of doing business in California"); *United States v. Toyota Motor Corp.*, 561 F.Supp. 354, 359 (C.D.Cal.1983) (same).

## V.

For the foregoing reasons, I believe that the District Court was without jurisdiction to hear this case. I therefore dissent.

9. Unlike subject matter jurisdiction, personal jurisdiction is predominantly a matter of state law, both in diversity and federal-question cases alike. *See, e.g., Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987); *Michigan Nat'l Bank v. Quality Dinette, Inc.*, 888 F.2d 462 (6th Cir. 1989). Further, personal jurisdiction analysis focuses on the "fairness" of forcing a defendant

to defend an action in a given forum, whereas the subject matter jurisdiction inquiry in a diversity case centers on whether a particular court is competent to hear a controversy. Competence in a diversity case turns on the citizenship of the parties, not a defendant's "contacts" with the forum state, and is based on a policy—prejudice against outsiders—that is conspicuously absent in personal jurisdiction analysis.