**U.S.I. PROPERTIES CORP.,**
Plaintiff, Appellee,

v.

**M.D. CONSTRUCTION COMPANY,**
**INC., et al., Defendants, Appellees.**

**Appeal of COMPANIA DE DESARROL-**
**LO COOPERATIVO, Defendant.**

No. 87–1721.

United States Court of Appeals,
First Circuit.

Heard June 9, 1988.

Decided Oct. 25, 1988.

Rehearing and Rehearing En Banc
Denied Nov. 30, 1988.

Marcos Ramirez Lavandero with whom Dennis Simonpietri Monefeldt, Hato Rey, P.R., Salvador Tio, Rio Piedras, P.R., Gretchen Coll Marti and Ramirez & Ramirez, Hato Rey, P.R., were on brief for defendant, appellant.

Ruben T. Nigaglioni with whom Maria Soledad Pineiro and Ledesma, Palou & Miranda, Hato Rey, P.R., were on brief for plaintiff, appellee U.S.I. Properties Corp.

Harry E. Woods with whom Geoffrey M. Woods, Gerardo Mariani and Woods & Woods, Hato Rey, P.R., were on brief for defendant, appellee M.D. Const. Co., Inc.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

This appeal follows a five and a half week jury trial that resulted in a $12.5 million verdict for plaintiff USI Properties Corp. and for codefendant MD Construction Inc. Appellant, defendant Compañia de Desarrollo Cooperativo, raises a number of issues of very diverse nature and complexity. Having reviewed carefully the unnecessarily ponderous briefs and record, we affirm.

Background

The basic event underlying this complex case is the signing of multiparty agreements on October 17, 1978 ("1978 agreements"). The parties were USI Properties Corp. ("USI"), a Delaware corporation, Compañia de Desarrollo Cooperativo ("CDC") a public corporation of the Commonwealth of Puerto Rico, MD Construction, Inc. ("MD"), which is incorporated under the laws of Puerto Rico, April Industries Inc. ("April"), Government Development Bank for Puerto Rico, and the Royal Bank of Canada. April, a Delaware publicly owned corporation, is the sole owner of Futura Development Co. of Puerto Rico, itself the sole owner of MD.

The terms of the agreement were as follows: USI sold a parcel of land to MD where MD would construct a housing project called Ciudad Cristiana. The purchase price was $1,224,230, with a downpayment of $5,000. USI retained a mortgage on the land payable at the completion of the project, which, with interest, was worth approximately $1.6 million. April entered into the agreement as guarantor of MD.

A second agreement on the same date bound MD and CDC as follows: MD would build 700 housing units on the land purchased from USI and CDC would sell the houses to individual buyers. The Royal Bank of Canada provided CDC a revolving line of credit of $4.5 million to provide the interim financing for the project. The Bank commitment was secured by a $5 million note from MD, and by a first mortgage on the land sold by USI. In order for the Bank to obtain a first mortgage on the land, USI agreed to subordinate its lien to the Bank's lien.

CDC agreed to notify USI of any breach committed by MD or any variations in per-

formance by CDC. In early 1982, however, after completion and delivery of 480 units, CDC stopped financing the project, for reasons the parties still dispute. Once the flow of funds from CDC stopped, MD could not proceed with the project, and thus defaulted in its payment obligations to USI.

CDC sued MD in the Puerto Rico superior court in October 1983. Also in October, USI sued MD and CDC in federal court.

On October 26, 1983, one day before USI filed its complaint, USI, MD and April entered into an agreement ("1983 agreement") which included the following items:

1. MD conceded owing USI $1,585,000;
2. USI would sue MD and CDC in federal court;
3. USI would not execute against MD on the note or on any judgment until 30 months after the agreement;
4. MD and April assigned to USI any judgment or settlement resulting from federal or state actions or from any out of court settlement resulting from actions by or against CDC;
5. USI would sue April in the Superior Court of Puerto Rico only after 90 days from the date of the agreement;
6. MD and April would not raise defenses against USI nor assert any claim whatsoever against USI other than that the only party responsible for the failure of the project was CDC.

USI sued MD and CDC in federal court in October 1983. MD filed a crossclaim against CDC, which in turn filed a crossclaim against MD and a counterclaim against USI. Trial commenced on May 15, 1987 and lasted over five weeks. The jury returned a verdict in favor of USI, against CDC, for $1.2 million, and for MD on its crossclaim against CDC for $11.4 million.

One of CDC's main defenses was that the land used to develop the Ciudad Cristiana project was contaminated with mercury. Both the Secretary of the Department of Health and the head of the Environmental Quality Board testified about the reasons for their determination that the area had to be evacuated. Following this determination, the government had evacuated the area in 1985. The Ciudad Cristiana "scandal" resulted in extensive hearings in the Puerto Rico legislature.

The remaining facts will be provided as they become relevant to the issues on appeal.

*Discussion*

Appellant CDC raises a veritable barrage of issues. Given their diverse nature and complexity, we will discuss them sequentially as presented by CDC.

1. *Jurisdiction: Realignment of Parties*

CDC argues that USI and MD should be realigned as parties, based on the 1983 agreements, and relying on *Indianapolis v. Chase National Bank,* 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47 (1941). Such a finding would divest the federal courts of diversity jurisdiction. The issue boils down to the import of the 1983 agreements on the controversy at hand. CDC argues that the dominating controversy in this case is who is liable for breach of contract with regard to the Ciudad Cristiana agreements. Therefore, since both USI and MD agree that CDC should be liable, USI and MD are on the same side of the controversy and should be realigned as plaintiffs. If USI and MD were both plaintiffs, then there would be Puerto Rico corporations on both sides of the case—MD as a plaintiff and CDC as defendant—thus defeating diversity jurisdiction.

Our task is to determine "the primary and controlling matter in dispute," *Indianapolis,* 314 U.S. at 72, 62 S.Ct. at 18, and then determine whether any actual collision in interests remains. In other words, are USI and MD "partners in litigation"? *Id.* at 74, 62 S.Ct. at 19. The reasons for such an argument are worthy. The 1983 agreement made USI and MD partners in litigation insofar they both alleged that CDC was the party ultimately responsible for the breach. Furthermore, MD agreed not to raise any defenses against USI.

Unfortunately for CDC, one key issue remained in controversy, namely, who would pay for the breach. Indeed, MD conceded its debt to USI, but that did not equate to payment at that time, since MD

consistently has held that CDC is the party responsible for the failure of the whole project. MD assigned to USI all amounts to be recovered in the action against CDC, but even assignment of amounts recoverable did not abate MD's risk.

The district court found there was a genuine conflict between the parties at the time USI filed its complaint. The court found that the 1983 agreements "all boil down to the fact that MD would eventually transfer or assign to USI litigation proceeds in the amount of its debt from any judgment awarded MD against CDC." Opinion and Order, No. 83–2647, slip op. at 11 (D.P.R. June 29, 1987). The court further stated:

> The plaintiff and MD, although having common strategies against CDC, indeed had different interests. USI's interest is to, in its day, execute against MD and, eventually, annul CDC's first-ranking mortgage or to recover directly from [MD]. MD's interest is to recover its own damages and to pay USI. Realignment is not called for under these circumstances. *City of Dawson v. Columbia Ave. Saving Fund,* 197 U.S. 178 [25 S.Ct. 420, 49 L.Ed. 713] (1905); *Dolch v. United California Bank,* 702 F.2d 178 (9th Cir.1983) (in an estate's context); *Hopkins Erecting Co. v. Brianwood [Briarwood] Apartments,* 517 F.Supp. 243 (E.D.Ky.1981) (in a removal context). Accordingly, we find that jurisdiction under 28 U.S.C. § 1332 lies.

*Id.* at 14.

We agree. Looking at the pleadings, and at the background of this action, we find that the court below correctly found diversity jurisdiction. This is a close case in an area where the applicable law is not especially enlightening. However, the court's findings are clearly supported by the record and reflect appropriate application of *Indianapolis* and progeny. MD's concession of liability meant the unavoidable realization that it would pay—yet to be determined, however, was the most crucial detail of whether payment would be out of its own funds or out of monies recovered from CDC. There remained a real conflict of interests between the parties.[1] *See* 3A J. Moore, J. Lucas, G. Grotheer, *Moore's Federal Practice* ¶ 19.03, 19–52 (2d ed. 1987).

### 2. *Jurisdiction: Collusion*

CDC's next line of attack, again pegged to the 1983 agreements, is based on 28 U.S.C. § 1359, which states that "[a] district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." Under this statute, courts must determine whether any party has been artificially brought into or left out of an action in order to invoke the jurisdiction of the federal court.

■ The district court, relying on *Kramer v. Caribbean Mills,* 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969), found that arguing collusion did not assist CDC much because it is not on account of the 1983 agreement that USI is a plaintiff in this case. This case stems from the multilat-

---

1. Another perhaps useful approach to this difficult problem, exemplified in *Fidelity & Deposit Co. of Maryland v. Sheboygan Falls,* 713 F.2d 1261, 1268 (7th Cir.1983), is to speculate on a different scenario: if the party to be realigned had been left out of the lawsuit, would that party be indispensable under Fed.R.Civ.P. 19? And if so, on what side of the lawsuit? If the lawsuit had commenced with USI as plaintiff and CDC as the sole defendant, MD would undisputably have been found to be an indispensable party under both R. 19(a)(1) and (a)(2). *See Acton Co., Inc. of Massachusetts v. Bachman Foods, Inc.,* 668 F.2d 76, 78–79 (1st Cir.1982). More difficult would be to place MD as plaintiff or defendant, since the 1983 agreement would seem to make MD a plaintiff as to CDC, whereas the debt on the note would certainly make it a defendant as to USI. However, in our exercise of "if history," MD would still be a defendant, since CDC would have had to bring MD into the lawsuit in the posture of a third party defendant, brought in as the party ultimately liable for USI's claim against CDC.

As to USI, MD remained a defendant even after the 1983 agreement, since MD still owed USI the debt the note certified. A judgment on this debt would be facilitated, not precluded, by MD's concession of its debt. Therefore, even under this approach MD would still be a defendant, and the federal court would still have subject matter jurisdiction.

eral agreements that would have led to the construction of the Ciudad Cristiana project. USI is not a party brought in only to manufacture diversity jurisdiction. Neither is MD placed as a defendant due to some contrivance. MD was liable to USI under a promissory note, and had a colorable (indeed, ultimately successful) claim against CDC.

■ CDC raises two more arguments sounding in collusion. April was not sued, even though it was a party to the 1978 agreements and even though it ultimately could face liability as a guarantor for MD. Indeed, April was a party to the 1983 agreement, and there was some evidence that obtaining federal jurisdiction was a consideration in leaving April out of the complaint. However, given April's role as guarantor to MD's note to USI, USI could choose to sue the note issuer, the guarantor, or both. Without any artificial shifting of roles, USI could sue only MD and CDC.

■ The remaining issue is the allegedly stealthy way in which the agreements were entered into and later "hidden" from CDC and the court. It is unclear how appellants learned of the 1983 agreements. According to appellants, they had to conduct some imaginative sleuthing to find the agreements. According to appellees, it was there for the asking, and were in fact provided upon request. Any delay was the result of the fact that the assignment agreements bore no relevance to the breach that caused the lawsuit.[2]

The court below correctly found that "the MD–USI assignment does not bestow on USI the rights under which it sits as plaintiff. With or without assignment, diversity jurisdiction among the parties exists." Opinion & Order No. 83–2647, slip op. at 9 (D.P.R. June 29, 1987). We note, furthermore, that parties may legitimately try to obtain the jurisdiction of federal courts, as long as they lawfully qualify

under some of the grounds that allow access to this forum of limited jurisdiction. On the other hand, using a strawman, or sham transactions, solely for the creation of otherwise unobtainable jurisdiction, is clearly forbidden both by statute and by the policies that underlie diversity jurisdiction.

### 3. Jurisdiction: USI's Principal Place of Business

■ CDC's next line of attack is to argue that diversity jurisdiction does not lie because USI's principal place of business is Puerto Rico. CDC does not challenge the court's application of the "principal place of business test." See Topp v. Compair Inc., 814 F.2d 830, 834 (1st Cir.1987). Instead, CDC focuses on the factual basis for the court's determination, namely, that the evidence produced by both parties supported the finding that Puerto Rico was USI's principal place of business. The court's determination that New York is USI's principal place of business is to be affirmed unless found to be clearly erroneous. See Valedón Martínez v. Hospital Presbiteriano, 806 F.2d 1128 (1st Cir.1986).

■ The court reviewed evidence offered by CDC and concluded that policy decisions were made in New York, where the administrative offices were located, and that the last tax returns had been filed in New York. The record supports these findings, and thus we cannot find that the court's determination was clearly erroneous.

### 4. Jurisdiction: April as an Indispensable Party

The next arrow in CDC's quiver is based on arguing that April is an indispensable party, which would defeat diversity jurisdiction because USI and April are both citizens of Delaware.

April is the "grandparent" of MD; MD is the wholly owned subsidiary of Futura,

---

**2.** CDC proceeds to accuse opposing counsel of fraud upon the court, which counsel for USI and MD vehemently deny. It is not the role of this court to determine the veracity of statements by officers of the court, as all lawyers are. As far as we can tell, however, these alle-

gations are without justification. It is, furthermore, highly unbecoming to allow allegations of fraud upon the court to appear as part of the substantive argumentation. Careful research and cogent reasoning, not aspersions, are the proper tools of our trade.

itself a wholly owned subsidiary of April. April's role in the original agreements is that of a guarantor of the USI note, liable jointly and severally with MD.

This court set out the applicable guidelines for the treatment of indispensable parties in relation to diversity jurisdiction.

Rule 19 of the Federal Rules of Civil Procedure provides for the joinder to a suit of parties needed for its just adjudication. The rule furthers several related policies, including the public interest in preventing multiple and repetitive litigation, the interest of the present parties in obtaining complete and effective relief in a single action, and the interest of absentees in avoiding the possible prejudicial effect of deciding the case without them. Rule 19(a) sets forth three types of parties to be joined if feasible; but if joinder will divest the court of subject matter jurisdiction, Rule 19(b) directs the court to "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed."

*Acton Co., Inc. of Mass. v. Bachman Foods, Inc.*, 668 F.2d 76, 78 (1st Cir.1982).

Without articulating any reasons for this finding, the district court concluded that April was not an indispensable party. Providing a bit more reasoning, we agree.

■ Under Puerto Rico law, when a guarantor is solidarily bound with a debtor, namely, jointly and severally liable, a plaintiff claiming on the debt can sue one, the other, or both. 31 P.R. Laws Ann. § 4871, *et seq.* (1968), *Colón v. P.R. & Am. Insurance Co.*, 63 P.R.R. 332, 340–41 (1944). By law, therefore, a guarantor is not an indispensable party under Puerto Rico law for purposes of Rule 19 because, as to these parties, complete relief was available without the need to bring in April. There is no danger of repetitive proceedings because if April's rights ever came into play they would only affect its relationship with MD, the principal debtor, not affecting the merits of the USI–MD–CDC lawsuit.

We note that CDC's allegations ring hollow in light of the fact that in a parallel action in Puerto Rico courts, it chose to sue MD, without including the now allegedly indispensable party.

5. *Jurisdiction: MD as an Alter Ego of April*

■ In yet another attempt at challenging federal jurisdiction, CDC next raises the issue of MD's existence as a separate corporate entity. CDC would have us find that MD's citizenship is that of its grandparent corporation, Delaware, which would defeat diversity with USI. CDC correctly points out the legal standard: subsidiary and parent corporations are generally considered to be separate entities for diversity jurisdiction purposes. *Topp v. Compair, Inc.*, 814 F.2d 830, 835 (1st Cir. 1987). The court there also stated that even if the parent corporation exerts a high degree of control through ownership or otherwise, and even if the separateness is perhaps only formal, the subsidiary's place of business is controlling for diversity purposes if the corporate separation is real and carefully maintained. *Id.* at 836. This is a factual determination, which we can overturn only if we find it to be clearly erroneous.

■ CDC argues that MD is not only a wholly owned subsidiary of April, but also shares all officers and directors with its grandparent corporation. MD does not contest this proposition. CDC further argues that MD does not prepare its own budget, construction requirements, or policies and procedures and that it is grossly undercapitalized. MD asserts it existed as a separate entity for seventeen years, and had surpluses ranging from $600,000 to $1,000,000. MD further states that it has always kept separate records, books, and minute books. The reason we go through this ping-pong exercise is to gauge the district court's basis for its finding that the alter ego doctrine did not make April the real party in this litigation. Clearly, the court had sufficient evidence for its conclusion.

6. *Ultra Vires*

Paradoxically, CDC argues that its signing the 1978 agreements was forbidden by

Puerto Rico law. CDC is a public corporation created for the purpose of furthering "the swiftest expansion of the Puerto Rican cooperative movement." P.R. Laws Ann. tit. 5, § 981b (1982). On its face, the statute makes no statement as to the reach of CDC's legitimate activities. On the contrary, § 981e(a) states that "[t]he Company shall foster, by such means as it may deem most desirable, the development and expansion of cooperative enterprises by helping them promote, initiate, and maintain in operation *all kinds of economic activities*" (emphasis added). Ambiguity enters through another door. The Department of Housing, created by Law 97 of June 10, 1972, P.R. Laws Ann. tit. 3, § 441, *et seq.* (1982), is "responsible for making and executing the public policy on housing and communal development of the Commonwealth of Puerto Rico, and of administering all the governmental programs in this field." *Id.* § 441b. From this language, appellants infer that the Department of Housing has *exclusive* authority for the construction of any kind of housing projects by the Commonwealth government.

Facially, this argument does not carry much weight. Section 441b(e) states, as one of the functions of the Housing Department:

(e) To develop the construction of housing projects for cooperatives organized by government organizations responsible for this function. It being understood, further, that the Department of Housing shall coordinate and refer to the agencies of the Cooperative Development Administration and the Cooperative Development Company of Puerto Rico the groups interested in the organization of housing cooperatives to be guided as to everything related with the organization and operation of this kind of cooperative. Provided, that said agencies shall retain the functions of promotion, development, education, organization and qualification of members of housing cooperatives.

The specific reference to CDC and its possible interplay with the Department of Housing casts appellant's argument in a very dim light. But from this statutory basis, we must go back to the factual history of the case to determine whether the ultra vires argument obtains.

CDC had approval from its own counsel and from its finance committee to enter into the 1978 agreements. The Government Development Bank, fiscal agent for CDC (and for the Commonwealth government in its entirety, *see* P.R. Laws Ann. tit. 7, § 581 (1982)), approved CDC's role in the project. Appellees contend, and CDC does not challenge, that the Department of Housing supervised CDC's participation in this enterprise. Furthermore, the Puerto Rico Housing Bank, a public corporation "attached" to the Department of Housing (*see* P.R. Laws Ann. tit. 3, § 441e (1982)), actively participated in the 1978 agreement in the role of guarantor to the mortgages for the project.

From this perspective, it may seem amazing that an ultra vires argument should arise at all. However, the Department of Justice issued an opinion early in 1982 to the effect that CDC had no stated or constructive powers to develop cooperative housing projects. *See* 1982 Op.Sec.Jus. No. 8. This position was confirmed by the Comptroller General of Puerto Rico.

 We note first that the opinions of the Secretary of Justice of Puerto Rico are not binding upon the courts. *Meléndez Ortiz v. Valldejuli*, 87 J.T.S. 112, n. 7 (1987). Further, under Puerto Rico law, great deference is due to an agency's construction of its powers pursuant to its organic act, *Hernández Denton v. Quiñones Desdier*, 102 D.P.R. 220 (1974). We find, based on the statutory language and on the housing agencies' reading of the statute (as expressed also by the participation of the Department of Housing and the Housing Bank), that the court did not err in finding that CDC did not act beyond its statutory powers in entering into the 1978 agreements.

### 7. *Improper Statements by MD Counsel*

 CDC seeks reversal based on several statements made by MD's counsel dur-

ing closing argument, regarding the veracity of CDC's witnesses. MD counsel used the words "corrupt," "conspirators," "lies," "prevarications" and others to refer to the testimony of CDC's witnesses. CDC did not object at the time.

Our task is to review the court's decision to allow the statements under the "plain error" standard. *Emery–Waterhouse Co. v. Rhode Island Hosp. Trust Nat'l Bank*, 757 F.2d 399, 410 (1st Cir.1985). In the context of civil cases, we have stated that judges have "considerable discretion." *Id.*

We find the language in *Service Auto Supply Co. of P.R. v. Harte & Co.*, 533 F.2d 23 (1st Cir.1976) especially applicable to this case:

> Appellant sees fit to challenge the closing argument of appellee's counsel. It does indeed appear, in cold print, somewhat Gothic and extreme. But there was no call on the court to halt the excess of verbal imagery or invocation to the poets. We cannot fault the court. And perhaps opposing counsel felt that the effort would trip on its own ebullience. This kind of play must normally be left to counsel and the trial court, at least in a civil case.

*Id.* at 28. While we do not take kindly to statements of counsel's opinions, *see Polansky v. CNA Insurance Company*, 852 F.2d 626, 628 (1st Cir.1988), in a civil case and absent timely objection, "we cannot fault the court."

### 8. *Discovery*

 CDC and MD struggled strenuously to get more time for discovery, which the court steadfastly resisted (although the trial was postponed for 45 days to allow termination of discovery). Now that each party has its lot, CDC finds offense in the court's direction (whereas MD now apparently sees the wisdom of the court's rulings).

The basic allegation is that the district court considered more important the "public interest" of not having a case lie on its docket for a long time, over the actual interests of the litigants. *See Alamance*

*Industries, Inc. v. Filene's*, 291 F.2d 142, 147 (1st Cir.1961).

We have reviewed the voluminous files of this case and find that the district judge grabbed control of a complex and controversial litigation effectively, and stringently, in the face of a deluge of papers. We note that the issues deemed insufficiently addressed—mercury contamination and the arguably political background of the case—were addressed at trial and that the main characters in the decision-making process of all parties were deposed and/or examined and cross-examined at trial. There is no indication of abuse of discretion.

### 9. *Rule 37 motions*

Shortly before and even during trial, CDC filed Motions under Fed.R.Civ.P. 37 requesting dismissal of appellees' claims arguing that it was unprepared to go to trial because of failure to disclose on their part. Appellant's argument raises no compelling issues. We have reviewed the record and find no abuse of discretion.

### 10. *Polling the jury*

 On June 18, 1987, while the trial was in progress, a major newspaper published an article with the headline "Contractors Exonerated," and a smaller headline read "The Commonwealth Loses the Ciudad Cristiana Case." The court alerted counsel of the article and, after hearing argument, decided not to poll the jury about whether they had seen the headlines or article. The court stated:

> THE COURT: Remember, Mr. Simonpietri [CDC counsel], that none of the issues that are published in the story which relates to the voluntary dismissal of complaints, basically[,] [a]nd the potential economic impact this may have on the Government, as a result of the voluntary dismissal and other expenditures that the newspaper claims have been related to this case, is not going to be before them for decision anyway. That is not part of what they are going to decide. And I don't think I should poll the Jury under those circumstances.

What I will do is, I will instruct them accordingly as I have done in the past in a more expanded fashion, about what is it they can do or cannot do from the standpoint of newspapers. As I said before, we should not presume that Jurors are here violating their duties and their sworn obligations. We should presume that the possibility always exists that they are confronted with the material. But we must presume, that as good citizens, as I am sure they all are, they are going to respect the Court's instructions on that issue.

Throughout the trial, the court repeatedly instructed the jury to avoid media exposure. The court's balanced approach is both appropriate and desirable in the context of a civil case, considering the possibility of prejudice, the contents of the article, and the costs to litigants and to the courts.

## 11. *New Trial*

CDC requests a new trial on three grounds, only two of which deserve discussion.

### A. Sufficiency of the Evidence

We have stated repeatedly the standard to overturn a trial court's decision not to grant a new trial: the appellant "must show that the verdict was 'so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice.'" *Jordan v. United States Lines, Inc.*, 738 F.2d 48, 49 (1st Cir.1984) and cases cited therein.

■ We have reviewed the record, and find that this case is not even a close one. CDC is attempting to convince us of an *interpretation* of documents presented in evidence based on correspondence prior to the 1978 agreements and communications after the agreements, to find that MD had a responsibility to obtain financing for the project. CDC even qualifies its conclusion by stating that "the jury's verdict is clearly unsupported by the evidence, *or at least clearly against the great weight of the evidence.*" We refuse to accept the invitation to engage in fact finding; it is now late to retry the case.

### B. Parol evidence

■ Under Puerto Rico law, if the words of a contract appear contrary to the evident intention of the contracting parties, the acts of the parties, both contemporaneous with and subsequent to the contract, are evidence relevant to the contract's interpretation. P.R. Laws Ann. tit. 31, §§ 3471 and 3472. *See Marina Industrial, Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983) (the strict mandate of § 3471 requires the court to abide by the literal meaning of the terms of the contract when they leave no doubt as to the intention of the contracting parties).

■ The court did not allow the introduction for the purpose of clarifying the contract of two letters issued prior to the 1978 agreements from which CDC would have argued that MD was the party responsible for obtaining financing for the project. The documents were admitted for other purposes. The crucial language, pointed out by CDC, is as follows:

> "[April] will develop the project and sell the houses to [CDC] who in turn will sell the houses to individual persons. The number of houses April will sell to CDC each year will be equal to the permanent mortgage financing to be provided by the Farmers Home Administration. Presently such financing has been set at 200 housing units per year."

August 14, 1978 letter from April's president to CDC's president.

This letter is not illuminating as to the intent of the parties regarding who was responsible for obtaining financing. Furthermore, USI contends that the "real" intent of the parties forms no part of the pleadings. There was, however, a conflict between the purchase and sale agreement and the loan agreement, as to who would obtain permanent commitments. For that purpose, both MD and CDC examined and cross-examined the principal officers of both entities. The import of the absence of the letters in the face of extensive testimony by the actual actors can only be described as minimal.

### C. District Court Comments

CDC argues that several comments by the trial judge influenced the jury to such extent that a miscarriage of justice can be avoided only by ordering a new trial. Citing no authority in support of its requested remedy, CDC finds the harm to be self-evident. We have reviewed the transcript and we see no prejudice in any of the comments cited in appellant's brief. We therefore give this matter no further consideration.

### 12. *Remaining claims*

The remaining claims, attacking the jury findings regarding lack of reputation, damage computation, and sufficiency of the evidence relating to damages, lack merit.

For the reasons stated in this opinion, the judgments below are *affirmed*.