**James I. MADAY, Plaintiff,**

v.

**TOLL BROTHERS INC.,
et al., Defendants.**

No. Civ.A. 99–1120–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 18, 1999.

William H. Bode, Bode & Beckman, L.L.P., Washington, DC, for Plaintiff.

Michael Joseph McManus, Drinker, Biddle & Reath, L.L.P., Washington, DC, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff, who, with his wife, purchased a house from defendants, asserts a Lanham Act claim and several state law claims against defendants, based on defendants' alleged misrepresentations regarding the nature of building materials used in the construction of the house. Defendants' motion to dismiss presents two threshold jurisdictional issues: (i) whether plaintiff, as a consumer, may seek relief for false advertising pursuant to the Lanham Act, 15 U.S.C. § 1125, and thus claim federal question jurisdiction pursuant to 28 U.S.C. § 1331, and if not, (ii) whether complete diversity exists between plaintiff and defendants, thereby furnishing a basis for the exercise of federal jurisdiction over plaintiff's remaining state claims.

### I.[1]

Plaintiff James Maday, a citizen of Virginia, claims that defendants Toll Brothers, Inc., ("Toll Brothers") and Hunter Mill Limited Partnership ("Hunter Mill") misrepresented the nature of certain building materials used in constructing the house he and his wife purchased from defendants. Toll Brothers is a Delaware corporation with its principal place of business in Pennsylvania, while Hunter Mill is a Virginia limited partnership with two partners, both of which are corporations: Toll VA GP Corp. ("Toll VA") is the general partner, and Toll Bros., Inc., ("Toll Bros.") is the limited partner. Both of these entities are formally distinct from defendant Toll Brothers.

■ According to the complaint,[2] plaintiff initially approached Toll Brothers based on the company's reputation as a home builder and seller, and reviewed several brochures describing houses built by Toll Brothers. Among the models he examined was the "Sterling Provincial," a house the brochure described as having "stucco detailing," and that Toll Brothers representatives described as a "stucco home." Plaintiff and his wife preferred stucco, and defendants' representatives assured them that a stucco exterior would not require any additional maintenance as compared with other house exteriors. Apparently encouraged by the company's statements and brochures and the prospects of owning a newly constructed stucco home, plaintiff and his wife decided to purchase a Sterling Provincial, to be built in the Hunter Mill Estates subdivision, located in Vienna, Virginia.

As it turned out, the home's facade was not constructed with stucco,[3] as plaintiff had been led to believe, but rather with the External Insulation Finish System ("EIFS"), a synthetic substitute. More-

---

**1.** Seventeen other lawsuits, brought by over thirty plaintiffs, were filed at or near the same time as this suit, each alleging the identical Lanham Act federal claim and essentially similar state law claims. To the extent that there are variations among the suits in the state law claims asserted, those variations are not material to the resolution of the issues addressed here. Accordingly, the reasoning and result reached in this suit also controls the remaining suits, in each of which the identical dismissal motion is pending.

**2.** In considering the substance of plaintiff's claim on a motion to dismiss, the facts alleged in the complaint must be taken as true. *See*

*Revene v. Charles County Comm'rs*, 882 F.2d 870, 872 (4th Cir.1989). For matters of jurisdiction, however, it is permissible to consider evidence outside of the complaint. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir.1995).

**3.** Plaintiff notes that his understanding of the term "stucco" was the layman's understanding of the term, that is, "an exterior finish ... composed of cement, sand, and hydrated lime mixed with water and laid on wet." Complaint ¶ 12 (quoting Random House College Dictionary 1304 (Rev.Ed.)).

over, defendants were aware of plaintiff's mistake of fact, yet failed to correct him. Specifically, defendants' agents sat silent while plaintiff indicated what color of stucco he preferred, gave plaintiff an information packet that described methods of maintaining stucco, and referred to the house's "stucco" exterior during plaintiff's final inspection.

According to the complaint, defendants' misrepresentations were not harmless, as the decision to use EIFS had significant structural and maintenance ramifications. First, houses built with an EIFS exterior apparently have a tendency to trap more moisture than other homes, making EIFS houses more vulnerable to wood rot, a fact plaintiff claims is known generally in the construction industry. Second, defendants allegedly compounded the damage by mis-applying the EIFS exterior, apparently ignoring the EIFS manufacturer's instructions. In short, plaintiff claims he suffered significant damages as a result of defendants' misrepresentations concerning the house's exterior and then their misapplication of the EIFS exterior.

Plaintiff seeks relief from Toll Brothers and Hunter Mill[4] under a variety of theories, including one federal false advertising claim pursuant to the Lanham Act, 15 U.S.C. § 1125, and several state statutory and common law claims, such as breach of warranty and violation of the Virginia Consumer Protection Act, Va.Code § 59.1–196 *et seq.* In a threshold Rule 12 motion, defendants seek dismissal of the complaint, claiming that plaintiff, as a consumer, lacks standing to sue for false advertising under the Lanham Act, and that the remaining state claims must also be dismissed because complete diversity between plaintiff and defendants is lacking. The matter has been fully briefed and is ripe for disposition.

## II.

Plaintiff first asserts federal question jurisdiction pursuant to 28 U.S.C. § 1331 based on his single federal claim brought pursuant to the Lanham Act, 15 U.S.C. § 1125(a).[5] Specifically, he claims that defendants' misrepresentations concerning the use of stucco in the construction of the house he purchased constitute false advertising actionable under § 1125. Defendants respond that § 1125 provides a remedy for commercial injuries only; it provides no remedy or cause of action for the consumer injury alleged by plaintiff. Consequently, plaintiff cannot rely on § 1125 as a basis for relief or jurisdiction.

The question presented, therefore, is whether § 1125 grants plaintiff standing to sue for the consumer injury he alleges. Well-reasoned authority compels the conclusion that the Lanham Act does not confer standing on plaintiff for this purpose. Every circuit that has confronted this issue has reached this result, concluding that the Lanham Act provides a remedy only for a commercial injury.[6]

---

**4.** One of the other lawsuits, *Hilmi v. Toll Brothers, Inc.*, Civ. No. 99–1188–A, was filed against Toll Brothers and Great Falls Hunt Limited Partnership ("Great Falls"). This difference is immaterial to the determination of *Hilmi*, however, in that the partnership structure and operation of Great Falls is identical to Hunter Mill's.

**5.** 15 U.S.C. § 1125(a) provides as follows:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of

fact, or false or misleading representation of fact, which

. . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

**6.** *See, e.g., Barrus v. Sylvania*, 55 F.3d 468, 470 (9th Cir.1995) (barring a consumer's complaint that "Energy Saver" light bulbs were not as advertised); *Serbin v. Ziebart Int'l Corp., Inc.*, 11 F.3d 1163, 1179 (3d Cir.1993)

And although the Fourth Circuit has not squarely decided this issue, at least one district court in this circuit has agreed with this authority, noting that the Fourth Circuit has "implicitly approved restriction of standing under the Lanham Act to commercial interests."[7] The statutory construction that compels this result was clearly set forth by the Ninth Circuit in *Halicki v. United Artists Communications, Inc.*, 812 F.2d 1213, 1214 (9th Cir. 1987).[8] There, the Ninth Circuit noted that even though § 1125's plain language would seem to allow "any person" to bring a suit under the Lanham Act, Congress, in an "unusual, and extraordinarily helpful"[9] passage, made clear that the Act's purpose was limited to protecting "persons *engaged in ... commerce against unfair competition.*" 15 U.S.C. § 1127 (emphasis added).[10] Thus, the Ninth Circuit concluded, the Lanham Act does not provide a cause of action for every person who suffers in some way because of false advertising, but only for those who allege a competitive injury. *Halicki*, 812 F.2d at 1214. One must be the victim of unfair competition, in other words, and not simply a customer-victim of a company's unfair sales techniques. The Second Circuit, the first court to decide this issue, noted that allowing a claim such as plaintiff's would create a federal consumer protection cause of action, preempting existing state remedies in an area traditionally governed by state law.[11] Concluding that it was within Congress's power to create such a cause of action, the Second Circuit correctly observed that "had Congress contemplated so revolutionary a departure [from the role of state law in this field] ..., its intention could and would have been clearly expressed." *Colligan*, 442 F.2d at 694.

In sum, plaintiff's argument focuses too narrowly on the language of § 1125 alone; that language must be construed, and its scope determined, by reference to Congress's purpose in enacting the Act as a whole, which purpose is plainly set forth in § 1127. As § 1127 makes clear, § 1125 is a remedy only for commercial injuries. And, although there may be some ambiguity as to the total universe of such injuries,[12] that ambiguity need not be parsed in this case as plaintiff's injury is clearly not based on a commercial interest. De-

---

(holding that consumers could not bring suit based on false advertising regarding a rust protectant they purchased); *Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686, 689–94 (2d Cir.1971) (holding that the Lanham Act did not provide relief for school children whose ski trip failed to meet expectations).

**7.** *See Cromer v. Lounsbury Chiropractic Offices, Inc.*, 866 F.Supp. 960, 964 (S.D.W.Va. 1994) (citing *Mylan Laboratories, Inc., v. Matkari*, 7 F.3d 1130, 1139 (4th Cir.1993)).

**8.** This case held that one must suffer an injury from a competitor to bring a false advertising claim under the Lanham Act, and did not address the question of consumer standing directly. *Halicki*, 812 F.2d at 1214–15. A later Ninth Circuit opinion relied in part on *Halicki*, however, in concluding that consumers lacked standing to bring suit under the Lanham Act. *See Barrus*, 55 F.3d at 470.

**9.** *Halicki*, 812 F.2d at 1214.

**10.** 15 U.S.C. § 1127 provides, in pertinent part, as follows:

The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

**11.** *See Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686, 691–93 (2d Cir.1971); *see also Serbin v. Ziebart Int'l Corp.*, 11 F.3d 1163 (3d Cir.1993).

**12.** *See Serbin*, 11 F.3d at 1171–75 (discussing the types of "commercial injuries" considered by courts).

fendants' allegedly false advertising did not disparage a product or a service offered by the plaintiff, nor did it render competition between defendant and plaintiff unfair based on inflated or misleading claims about defendants' own products or services. Instead, defendants' allegedly false statements induced plaintiff to purchase a home he would not otherwise have purchased, and whatever injury arose from that purchase can only be construed as a consumer injury. In this circumstance, the Lanham Act affords plaintiff no personal remedy.

### III

Because plaintiff cannot state a claim under the Lanham Act, there is no basis for federal question jurisdiction. Accordingly, the next question is whether there is any basis to exercise federal jurisdiction over plaintiff's remaining state claims. As the sole federal claim has been dismissed well in advance of trial, it would be imprudent to exercise supplemental jurisdiction over the remaining state claims. *See* 28 U.S.C. § 1367.[13] Thus, the only remaining possible basis for federal jurisdiction over plaintiff's state law claims is diversity jurisdiction. *See* 28 U.S.C. § 1332. Yet, a review of the record as a whole compels the conclusion that diversity does not exist, as Hunter Mill is not diverse from plaintiff because Hunter Mill's general partner, Toll VA, like plaintiff, is a citizen of Virginia.

**13.** *See also United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Kendall v. City of Chesapeake,* 174 F.3d 437, 444 (4th Cir.1999) (affirming district court's dismissal of workers' state law claim when their only federal claim had been dismissed).

**14.** The analysis here also applies to *Hilmi v. Toll Brothers,* because Great Falls Hunt L.P., the defendant limited partnership in that case, and Hunter Mill, the defendant here, share the same general partner, Toll VA. And, as shown here, it is the citizenship of Toll VA that defeats diversity with any Virginia plaintiff.

■ It is axiomatic that diversity jurisdiction exists only where the parties are completely diverse, meaning that while defendants may share common citizenship, plaintiff's citizenship must be different from that of all defendants. *See Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); *Athena Automotive, Inc., v. DiGregorio,* 166 F.3d 288, 289 (4th Cir.1999). Here, the parties agree that plaintiff is a Virginia citizen, and that defendant Toll Brothers is a citizen of Delaware, its state of incorporation, and Pennsylvania, the location of its principal place of business. *See* 28 U.S.C. § 1332. Thus, the only issue is whether defendant Hunter Mill[14] is a citizen of Virginia.

■ As a limited partnership, the citizenship of Hunter Mill is determined by reference to the citizenship of each of its partners. *See Carden v. Arkoma Associates,* 494 U.S. 185, 192–93, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). The fact that Hunter Mill was formed under the laws of Virginia is irrelevant to diversity analysis, as "[t]here is no such thing as 'a [Virginia] limited partnership' for purposes of the diversity jurisdiction. There are only partners, each of which has one or more citizenships." *Guaranty Nat. Title Co., Inc., v. J.E.G. Associates,* 101 F.3d 57, 59 (7th Cir.1996).[15] Similarly, the fact that Hunter Mill was formed to operate exclusively in Virginia is of no consequence, if the partners are not themselves citizens of Virginia.[16] Hunter Mill's citizenship is de-

**15.** *See Carden,* 494 U.S. at 189, 110 S.Ct. 1015 ("While the rule regarding the treatment of corporations as 'citizens' has become firmly established, we have ... just as firmly resisted extending that treatment to other entities."); *cf.* 28 U.S.C. 1332(c) (providing special citizenship rules for corporations).

**16.** *See ConnTech Development Co. v. University of Connecticut Educ. Properties, Inc.,* 102 F.3d 677, 681 (2d.Cir.1996) (holding that partnership composed of corporate citizens of New York and New Jersey was not a citizen of Connecticut, even though the partnership operated exclusively in Connecticut).

termined entirely and exclusively by reference to the citizenship of its partners. And because the limited partner, Toll Bros. (a corporate entity distinct from Toll Brothers), is not a citizen of Virginia,[17] the only remaining question is whether the corporation Toll VA, the general partner, is a citizen of Virginia.

■ As discussed above, a corporation is a citizen of the state in which it is incorporated, as well as the state in which it has its principal place of business. *See* 28 U.S.C. § 1332(c)(1). Toll VA is incorporated under the laws of Delaware, but defendants assert that its principal place of business is in Virginia. Because defendant has challenged the factual basis of plaintiff's jurisdictional claim, plaintiff bears the burden of producing evidence establishing that Toll VA's principal place of business is not in fact in Virginia. *See Sligh v. Doe,* 596 F.2d 1169, 1170 (4th Cir.1979) (quoting *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). Plaintiff in this case cannot meet this burden, as the evidence overwhelmingly indicates that Toll VA's principal place of business is in Virginia.

The determination of a corporation's principal place of business must be based on a factual inquiry into the corporation's operations at the time of filing. *See Athena Automotive,* 166 F.3d at 291. The Fourth Circuit recognizes two tests for determining a corporation's principal place of business, the "nerve center" test and the "place of operations" test. *See id.* at 290. The "nerve center" test considers the location of the corporation's "home office," that is, the place from which its operations are directed and controlled, whereas the "place of operations" test considers the locus of the bulk of a corporation's productive activity and daily operations. *See id.; Arbee Mechanical Contractors, Inc.,* 683 F.Supp. 144, 146 (E.D.Va.1988). The Fourth Circuit has concluded that the nerve center test should be limited to corporations that "engage[ ] primarily in the ownership and management of geographically diverse investment assets," a situation plainly not present here. *Athena Automotive,* 166 F.3d at 290. Toll VA's principal and only business is the development and sale of Virginia real estate,[18] and thus the place of operations test is the applicable analysis here.[19]

Under the place of operations test, the factual record compels the conclusion that Toll VA's principal place of business is Virginia. Specifically, Toll VA operates exclusively in Virginia, pays state taxes exclusively in Virginia, and owns more than $5 million in assets, primarily in the form of Virginia real estate through its 5% interest in the various Virginia limited partnerships of which Toll VA is a general partner.[20] Moreover, Toll VA has appointed over 160 officers, including the project managers for each limited partnership, most of whom operate on behalf of the

---

**17.** Toll Bros. is incorporated under the laws of Delaware, and its principal place of business is Pennsylvania. Thus, under 28 U.S.C. § 1332, Toll Bros. is a citizen of those two states, but not of Virginia.

**18.** This fact alone, of course, is not dispositive.

**19.** This conclusion is consistent with Congress's intent in amending the diversity statute in 1958 to restrict the availability of diversity jurisdiction by expanding corporate citizenship. *See Arbee,* 683 F.Supp. at 146–47 (noting that the place of operations test is most consistent with congressional intent); *cf. Topp v. CompAir, Inc.,* 814 F.2d 830, 834 (1st Cir.1987) (holding that nerve center test is appropriate for a holding company which itself had four subsidiaries doing business in five states).

**20.** A separate partnership develops and sells each "Toll Brothers" residential development in Virginia. Hunter Mill, for example, was formed to develop and sell Hunter Mill estates. Toll VA is the general partner of each Virginia partnership so formed, and in that role has a 5% interest in each partnership. The Toll Brothers-affiliated partnerships in Virginia own more than $100 million dollars in assets, most of which is in the form of Virginia real estate.

corporation exclusively in Virginia. These officers are authorized to enter into agreements that bind Toll VA and, in turn, the relevant limited partnership, which in this case is Hunter Mill. Although Toll VA does not have its own offices, some of its officers operate out of Toll Brothers' regional office in Dulles, Virginia, while many work on location at the various development sites in Virginia, where they conduct the partnerships' daily business. These facts point persuasively to the conclusion that Toll VA's principal place of business is in Virginia, and the fact that certain management decisions are made in Pennsylvania does not outweigh this conclusion.[21]

Plaintiff's primary challenge rests on his assertion that there is no difference between Toll VA and Toll Brothers, that Toll VA is simply a "conduit" for Toll Brothers' activity in Virginia, and therefore that Toll Brothers' citizenship should be attributed to Toll VA. In support of this allegation, plaintiff notes that Toll Brothers has 79 wholly-owned subsidiaries and 179 wholly-owned partnerships throughout the country, including Toll VA and Hunter Mill, and that Toll Brothers directs the operations of each of these affiliates.[22] Moreover, plaintiff indicates that Toll VA and Toll Brothers are both incorporated in Delaware, that both corporations describe their principal place of business in various documents and certificates as the same address in Pennsylvania,[23] and that the two corporations share certain officers and directors.[24] In addition, a Toll Brothers audit addressed the financial position of all of its subsidiaries, including Toll VA, and Toll VA's records are maintained at the Toll Brothers principal place of business in Pennsylvania. All of this, plaintiff concludes, demonstrates that Toll Brothers and Toll VA are not actually separate entities, and thus Toll VA cannot be said to have a principal place of business distinct from Toll Brothers.[25]

Plaintiff's argument, distilled to its essence, is that the formal parent-subsidiary

---

21. "Where a corporation is engaged in a single line of business with its operating functions located in one state and its executive and administrative offices located in another state, its principal place of business for diversity purposes is the former state [where its operating functions are located]." *Arbee*, 683 F.Supp. at 147 (quoting 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3625, at 633 (2d ed.1984)) (internal quotation marks omitted).

22. The fact that Toll Brothers directs some of the operations of its subsidiaries is relevant to principal place of business analysis, but is not dispositive. *Compare Toms v. Country Quality Meats, Inc.*, 610 F.2d 313, 315–16 (5th Cir. 1980) (holding that the parent's management from Texas of the Georgia subsidiary's activity was more significant than the subsidiary's activity in Georgia, making Texas the subsidiary's principal place of business), *with J.A. Olson Co. v. City of Winona*, 818 F.2d 401, 412–13 (5th Cir.1987) (holding that, even though the "primary financial and other management decisions" were made in Illinois, Mississippi nonetheless was the locus of the subsidiary's only manufacturing activity as well as certain other "[s]ignificant management decisions" and thus was the subsidiary's principal place of business).

23. Although perhaps relevant, this fact is not determinative, as "this Court is not bound by any statement of either party in determining its jurisdiction." *Overton v. Rainbo Baking Co. of Johnson City*, 239 F.Supp. 800, 801 (E.D.Tenn.1964); *see also* 13B Charles A. Wright & Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3625, at 639 ("[A] statement in the corporate charter regarding the location of a corporation's principal place of business is not controlling in applying Section 1332(c).").

24. This fact is also not dispositive. *See U.S.I. Properties Corp. v. M.D. Construction Co., Inc.*, 860 F.2d 1, 7 (1st Cir.1988) (holding that a wholly-owned subsidiary of a grandparent corporation nonetheless had a separate citizenship than the grandparent, even though the subsidiary shared all of its officers and directors with the grandparent).

25. Plaintiff finally asserts, although without convincing evidence, that Toll VA is completely uninvolved in any sales transactions. To the contrary, Toll VA, as general partner of Hunter Mill, owns a 5% interest in all property owned by the partnership, and also manages Hunter Mill as well as the other Virginia limited partnerships.

relationship in this instance should be ignored, and Toll VA should be treated as simply an agent of Toll Brothers, rather than as a separate corporation with a separate citizenship. This is incorrect. It is hornbook law that a parent and its subsidiary are treated as having separate citizenships, "even though the parent corporation exerts a high degree of control through ownership or otherwise." 15 Moore's Federal Practice § 102.56[7][a] (3d ed.1999).[26] This is true even assuming Toll Brothers makes corporate policy and major management decisions for its many subsidiaries.[27] The only question is whether the subsidiary and the parent maintained formal separation, *i.e.*, whether the subsidiary is a sham. Plaintiff has adduced no evidence tending to suggest that Toll VA is a sham corporation, or that corporate formalities were not observed.[28] Without such evidence, "the fact that a parent corporation exercises the control which is necessarily

incident to the full ownership of its subsidiary is insufficient, without more, to justify ignoring the separate corporate entities." *Topp v. CompAir, Inc.*, 814 F.2d 830, 837 (1st Cir.1987). Moreover, even were such evidence to exist, it is doubtful that Toll VA's corporate form should be disregarded here, as courts considering alter ego theories in other contexts typically require more; they require a plaintiff to identify "an element of injustice or fundamental unfairness" that justifies disregarding the corporate form.[29] No such evidence exists here.

In any event, even if plaintiff's alter ego argument were convincing, it is not clear that plaintiff could use such a theory to exclude consideration of Toll VA's principal place of business in a diversity analysis. First, even to the extent that the alter ego theory of corporate jurisdiction ever had any life,[30] it has long since become moribund.[31] And significantly,

**26.** *See also Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1142 (3d Cir.1972). In *Quaker State*, the plaintiffs made essentially the same argument that plaintiff makes here: "Appellants assert that perhaps the principal place of business of [the parent] should be the pertinent factor or standard, relying on the assumption that [the subsidiary] is really an agent of [the parent] or even that they should be deemed one entity." *Id.* The Third Circuit concluded, however, that even if there is an "integral relationship between parent and subsidiary," as long as the subsidiary maintains a separate formal identity its principal place of business is to be determined separately from the parent's. *Id.*

**27.** *See J.A. Olson Co. v. City of Winona*, 818 F.2d 401, 412–13 (5th Cir.1987) (finding that subsidiary's principal place of business was Mississippi, even though many important corporate decisions were made at the executive offices in Chicago); *Quaker State*, 461 F.2d at 1145 (holding that locus of "essential day to day activities and decisions" concerning the subsidiary's business was more significant in principal place of business analysis than the source of finances or technical training for the corporation).

**28.** Plaintiff's only evidence that Toll VA and Toll Brothers did not maintain proper corporate formalities are several canceled checks written to Hunter Mill L.P., but endorsed and deposited by Toll Bros., which plaintiff sug-

gests is evidence that Toll VA and Toll Brothers commingled funds. This argument, as it turns out, hinges on a misperception of the facts. Toll Bros., as discussed above, is not the same entity as Toll Brothers, but rather is a separate corporation that is the "paymaster" for all Toll Brothers affiliated entities. Toll Bros. is also the limited partner of Hunter Mill. It is entirely appropriate for the limited partner to act as depositor of checks written to the partnership. In short, the checks are not evidence that Toll VA and Toll Brothers disregarded corporate formalities.

**29.** *See Ost–West–Handel Bruno Bischoff, GmbH v. Project Asia Line, Inc.*, 970 F.Supp. 471, 478 (E.D.Va.1997) (citing *DeWitt Truck Brokers, Inc., v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686–87 (4th Cir.1976)).

**30.** *See Frazier v. Alabama Motor Club*, 349 F.2d 456, 459–60 (5th Cir.1965) (imputing the principal place of business of the parent to its subsidiaries when determining venue).

**31.** *See Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1120 (D.C.Cir.1991) (refusing to impute the citizenship of the subsidiary to the parent, even though the subsidiary actually was the alter ego of the parent); *Schwartz v. Electronic Data Systems, Inc.*, 913 F.2d 279, 283 (6th Cir.1990) ("When formal separation is maintained between a corporate parent and

courts that have acknowledged the alter ego theory in the diversity context have specifically restricted its use to the expansion of corporate citizenship,[32] and thus the restriction of diversity jurisdiction, and have rejected its application in the converse context, *i.e.*, the expansion of diversity jurisdiction by contracting citizenship.[33] Thus, even if the subsidiary were simply the parent's alter ego, that fact alone would not require a federal court to impute the parent's principal place of business to the subsidiary while ignoring the subsidiary's principal place of business, unless perhaps there were evidence that the corporate structure existed specifically to avoid diversity jurisdiction.[34] This record merely reflects that defendants have a complex way of doing business that relies on a vast network of affiliated partnerships and corporations. While there may be many reasons for this structure, there is no evidence that this structure was designed to avoid diversity jurisdiction. Barring such evidence, plaintiff's alter ego theory cannot succeed.

The result reached here is consistent with the purpose of diversity jurisdiction, which is to create a federal forum for strangers to a jurisdiction so that they may avoid whatever local prejudice might exist in a state forum. Plaintiff, however, is not a stranger to Virginia, nor are the alleged strangers apparently worried about prejudice in the state courts as they have vigorously opposed federal jurisdiction. In short, this case belongs in a Virginia court. Plaintiff is a Virginia domiciliary who bought a house in Virginia. When he became disappointed with that transaction, he brought several claims under Virginia law against two defendants, including a partnership formed in part by a corporation that operates entirely within Virginia to sell Virginia real estate. Accordingly, this matter must be dismissed for want of subject matter jurisdiction and thus without prejudice to the merits of the asserted claims.

its corporate subsidiary, federal court jurisdiction over the subsidiary is determined by that corporation's citizenship, not the citizenship of the parent."); *U.S.I. Properties Corp. v. M.D. Construction Co., Inc.*, 860 F.2d 1, 7 (1st Cir.1988) (refusing to impute citizenship of the parent to the subsidiary, even when subsidiary shared all of its officers and directors with the parent); *Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1145 (3d Cir.1972) (denying that subsidiary was the "agent" of the parent, even though there was "much interworking" between the parent and subsidiary); *Needham v. Wedtech (USA), Inc.*, 918 F.Supp. 353, 357 (N.D.Okla.1996) (noting that federal courts generally uphold the independence of the subsidiary while "giving lip service to the alter ego doctrine") (citations and internal quotation marks omitted); *cf. Fritz v. American Home Shield Corp.*, 751 F.2d 1152, 1153–54 (11th Cir.1985) (holding that alter ego theory cannot be used to ignore place of incorporation of the subsidiary).

**32.** *See, e.g., Frazier,* 349 F.2d at 459–60 (imputing the principal place of business of the parent to the subsidiary to expand the citizenship of the subsidiary, in order to establish venue, though not to establish diversity).

**33.** *See Olson,* 818 F.2d at 414 ("[T]he alter ego doctrine may not be used to create diversity jurisdiction by ignoring the principal place of business of a subsidiary corporation and imputing to it the principal place of business of the parent."); *Needham,* 918 F.Supp. at 358 ("For purposes of diversity jurisdiction, the alter ego doctrine cannot be used to create subject matter jurisdiction by imputing one entity's principal place of business to another entity."); 15 Moore's Federal Practice, supra, § 102.56[7][b] ("The alter ego doctrine may be used to increase the number of states of citizenship for the purpose of *reducing* the reach of diversity jurisdiction, but may not be used to extend jurisdiction.") (emphasis added).

**34.** *Cf. Glenny v. American Metal Climax, Inc.,* 494 F.2d 651, 655 (10th Cir.1974) (holding that, absent parent-subsidiary collusion to defeat jurisdiction, jurisdiction cannot be saved by piercing the corporate veil of a nondiverse subsidiary corporation that is an indispensable party).